UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DWAYNE D. WALKER, JR.,                          :
                                                :
                         Plaintiff,             :          No. 12-cv-5384 (ALC)(RLE)
                                                :
         vs.                                    :
                                                :
SHAWN CARTER ("JAY-Z"), DAMON                   :
"DAME" DASH, KAREEM "BIGGS" BURKE,              :
UNIVERSAL MUSIC GROUP, INC., ISLAND            :
DEF JAM MUSIC GROUP, ROC-A-FELLA               :
RECORDS, LLC,                                   :
                                                :
                         Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS UMG RECORDINGS, INC., THE ISLAND DEF JAM MUSIC GROUP, ROC-A-FELLA RECORDS, LLC, SHAWN CARTER, AND DAMON DASH'S MOTIONS FOR SUMMARY JUDGMENT

SHAPIRO ARATO LLP
Cynthia S. Arato
Chetan A. Patil
500 Fifth Avenue, 40th Floor
New York, New York 10110
Telephone: (212) 257-4880
Fax: (212) 202-6417
carato@shapiroarato.com
cpatil@shapiroarato.com

*Attorneys for Defendants UMG Recordings,*
*Inc. (erroneously sued as Universal Music*
*Group Inc.), The Island Def Jam Music*
*Group, a division of UMG Recordings, Inc.,*
*and Roc-A-Fella Records, LLC*

COWAN, DeBAETS, ABRAHAMS &
SHEPPARD LLP
Eleanor M. Lackman
Scott J. Sholder
41 Madison Avenue, 34th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
ELackman@cdas.com
SSholder@cdas.com

*Attorneys for Defendant Shawn Carter
("Jay Z")*

DALE LIONEL SMITH, ESQ.
Dale Lionel Smith
483 Broadway, Suite 502
New York, New York 10013
Telephone: (212) 219-1000
Fax: (212) 219-1002
dsmith@law-smith.com

*Attorney for Defendant Damon "Dame"
Dash*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 4

    A.    The Parties ................................................................................ 4

    B.    Walker's Story Regarding The Creation Of The Roc-A-Fella Logo ...................... 4

    C.    Walker's Story Regarding The Alleged Contract .................................... 6

    D.    Walker Is Unable To Corroborate The Contract's Existence And Proffers Testimony That Is Fatally Inconsistent About Its Terms ........................................ 7

        1.    Walker has no corroborating evidence of the contract or its terms ............ 7

        2.    Walker's own inconsistent testimony fails to establish the terms of the alleged agreement ........................................................................ 8

    E.    Defendants Dispute Walker's Ownership And Creation Of The Logo, And Walker Has Been On Notice Of This Dispute Since 1996 ................................... 10

    F.    Walker's Invalid And Fraudulent Copyright Registration And Deposit Copy ..... 11

ARGUMENT ................................................................................................... 12

I.    STANDARD OF REVIEW ................................................................................ 12

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WALKER'S CONTRACT CLAIM ..................................................................................... 13

    A.    Walker's Contract Claim Is Barred By The Statute of Frauds Because He Cannot Prove The Existence Or Terms Of His Supposed "Lost" Contract ..................... 13

        1.    The varying standards to prove a lost writing ............................................ 13

        2.    Under any formulation of the Statute of Frauds, Walker offers no competent witness testimony regarding his supposedly lost contract ...... 16

        3.    Walker's own inconsistent testimony also forecloses his contract claim, under any of the Appellate Division rules. ............................................... 19

        4.    Walker cannot prove his contract with clear and convincing evidence .... 22

    B.    Any Alleged Breach Of Contract By Defendants Was Discharged Because Walker Has Never Been Able To Perform Under The Alleged Contract ............. 23

III.   WALKER'S COPYRIGHT CLAIM IS BARRED BY THE THREE-YEAR STATUTE
       OF LIMITATIONS BECAUSE HIS DISPUTED OWNERSHIP OF THE LOGO IS THE
       DISPOSITIVE ISSUE ................................................................................... 25

IV.    WALKER HAS NO LEGAL OWNERSHIP INTEREST IN THE COPYRIGHT IN THE
       LOGO AND THEREFORE CANNOT MAINTAIN A CLAIM FOR COPYRIGHT
       INFRINGEMENT ......................................................................................... 27

       A.   Walker Does Not Own The Copyright In The Logo Because He Is Not The
            Author Of The Logo ............................................................................ 28

       B.   Walker Did Not Receive A Written Assignment Of The Copyright And
            The Logo Was Not Created As A Work Made For Hire ..................................... 29

V.     EVEN IF WALKER HAD AN OWNERSHIP INTEREST IN THE LOGO, HE
       GRANTED THE DEFENDANTS AN EXPRESS LICENSE TO USE IT .................... 30

VI.    WALKER'S COPYRIGHT CLAIMS ARE UNENFORCEABLE BECAUSE HIS
       COPYRIGHT REGISTRATION IS INVALID ................................................... 32

       A.   Walker Did Not Submit An Original Deposit Copy ............................................ 32

       B.   Walker Falsely Listed Himself As The Author Of The Logo ............................. 34

       CONCLUSION ................................................................................................ 35

ii

**TABLE OF AUTHORITIES**

**Cases**

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015) ........................................................ 29

*829 Post LLC v. Town of Eastchester*, No. 20672/05, 2007 WL 6782235
 (N.Y. Sup. Ct. Sept. 7, 2007) ...................................................................................... 17, 18

*A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12 (S.D.N.Y. 1989) .................................. 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 23

*Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315 (S.D.N.Y. 2003) ......................... 22

*BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880 (E.D. Ky. 2003) .......................... 23

*Boyce Thompson Inst. For Plant Research, Inc. v. Ins. Co. of N. Am.*,
 751 F. Supp. 1137 (S.D.N.Y. 1990) ................................................................................. 22

*Brand v. RMM*, No. 10 Civ. 0287 (AJP), 2011 WL 1496344 (S.D.N.Y. Apr. 18, 2011) ............. 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 13

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) .................................................. 28

*Coles v. Wonder,* 283 F.3d 798 (6th Cir. 2002) .......................................................................... 32

*Deeb v. Int'l Radiant Corp.*, 21 Misc. 2d 340 (Sup. Ct. 1959) ........................................ 16, 19, 20

*Dependable Lists, Inc. v. Malek*, 98 A.D.2d 679 (1st Dep't 1983) ........................................ 14, 15

*Donerail Corp. N.V. v. 405 Park LLC*, 30 Misc. 3d 1221(A) (Sup. Ct. 2011),
 *aff'd*, 100 A.D.3d 131 (1st Dep't 2012) ........................................................................... 24

*Edwards v. Noyes*, 65 N.Y. 125 (1875) ....................................................................................... 23

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) .................................................. 29

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013) ........ 26, 27

*Gemmink v. Jay Peak Inc.*, 807 F.3d 46 (2d Cir. 2015) ............................................................... 13

*Gummo v. Vill. of Depew*, 75 F.3d 98 (2d Cir. 1996) .................................................................. 13

*Horizon Inc. v. Wolkowicki*, 55 A.D.3d 337 (1st Dep't 2008) ..................................................... 16

*Horizon Inc. v. Wolkowicki*, No. 0600305/2005, 2008 WL 279228
 (N.Y. Sup. Ct. Jan. 15, 2008) .......................................................................................... 16

*JF Capital Advisors, LLC v. Lightstone Grp., LLC*, 25 N.Y.3d 759 (2015)..................... 14, 19, 21

*Kline v. Home Depot Inc.*, No. RDB-08-990, 2009 WL 2246656 (D. Md. July 27, 2009).......... 23

*Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998) .................................. 32

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011)................................................. 25, 26, 27

*La Capria v. Bonazza*, 153 A.D.2d 551 (2d Dep't 1989) ......................................... 22

*Lapidus v. N.Y.C. Chapter of N.Y. State Ass'n for Retarded Children*, 118 A.D.2d 122
      (1st Dep't 1986) ....................................................................... 15

*Lynch v. Savarese*, 217 A.D.2d 648 (2d Dep't 1995) ....................................... 15, 17, 18

*Matter of Talco Contractors v. N.Y. State Tax Comm'n*, 140 A.D.2d 834
      (3d Dep't 1988)................................................................... passim

*Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985) ....................................... 13, 22

*Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514 (S.D.N.Y. 2005).............. 34

*Nicosia v. Miller*, 229 A.D.2d 964 (4th Dep't 1996)................................... 15, 17, 18, 19

*Ortiz v. Guitian Bros. Music Inc.*, No. 07 Civ. 3897, 2008 WL 4449314
      (S.D.N.Y. Sept. 29, 2008)............................................................. 25

*Oursler v. Armstrong*, 10 N.Y.2d 385 (1961)............................................... 23

*Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336 (S.D.N.Y. 2002)................ 24

*Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120 (2d Cir. 2014)............................... 34

*Sadow Poskin Realty Corp.*, 63 Misc. 2d 499 (Sup. Ct. 1970)................................... 22

*Sandoro v. 9274 Grp., Inc.*, 114 A.D.3d 1276 (4th Dep't 2014)................................. 23

*Schober v. Hudson Valley Humane Soc'y for Prevention of Cruelty to Animals, Inc.*,
      89 A.D.3d 715 (2d Dep't 2011)..................................................... 24, 25

*Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316 (9th Cir. 1986) ............................... 32

*Shady Records, Inc. v. Source Enters., Inc.*, No. 03 CIV.9944 (GEL), 2005 WL 14920
      (S.D.N.Y. Jan. 3, 2005)............................................................... 35

*Simmons v. Stanberry*, 810 F.3d 114 (2d Cir. 2016)......................................... 25, 27

*Stone v. Williams*, 970 F.2d 1043 (2d Cir.1992)............................................. 26

iv

*Sunham Home Fashions, LLC v. Pem-America, Inc.*, No. 02 Civ. 6284 (JFK), 2002 WL 31834477 (S.D.N.Y. Dec.17, 2003) ........................................................ 35

*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998) ........................................................ 29

*Tolliver v. McCants*, No. 05 Civ. 10840, 2009 WL 804114 (S.D.N.Y. Mar. 25, 2009).............. 27

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692 (2d Cir.1991) .................................. 30

*United States v. Rem*, 38 F.3d 634 (2d Cir.1994) ........................................................ 13

*Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452 (2d Cir. 1989).................................... 34

*Wilson v. Wilson*, 37 A.D.3d 594 (2d Dep't 2007) ...................................................... 15

**Statutes, Rules, and Other Authorities**

17 U.S.C § 507.......................................................................................... 26

17 U.S.C. § 101 ......................................................................................... 30

17 U.S.C. § 102 ......................................................................................... 28

17 U.S.C. § 201 ....................................................................................... 28, 29

17 U.S.C. § 204 ......................................................................................... 29

17 U.S.C. § 408 ....................................................................................... 34, 35

17 U.S.C. § 411 ......................................................................................... 32

17 U.S.C. § 501 ......................................................................................... 28

Fed. R. Civ. P. 56 ....................................................................................... 12

N.Y. CPLR § 213......................................................................................... 21

Restatement (Second) Contracts § 238 ................................................................... 24

Williston on Contracts § 43:31 (4th ed.).................................................................. 24

Defendants UMG Recordings, Inc. ("UMG") (erroneously sued as Universal Music Group, Inc.), The Island Def Jam Music Group, a division of UMG Recordings, Inc., Roc-A-Fella Records, LLC ("RAF LLC"), Shawn Carter (p/k/a Jay Z), and Damon Dash respectfully submit this Joint Memorandum of Law in support of their Motions for Summary Judgment.

## INTRODUCTION

Plaintiff Dwayne D. Walker seeks to recover over $7 million based on a purported written "contract" that he claims he wrote by hand over 20 years ago and then "lost."  For the past four years, Walker has pursued his claims unreasonably and vexatiously – indeed, he and his counsel were recently sanctioned in the case (Dkt No. 309) – based on nothing more than his own self-serving, ever-shifting, and legally insufficient oral account of this supposed agreement. Walker claims that while he was hanging around with some of the Defendants in this case in 1995, he happened to see a logo design for the nascent Roc-A-Fella Records label.  He claims he told Defendant Damon Dash that he could "do better."  Even though Walker has no experience as a graphic designer and gave Dash no indication of how he would improve the design, he claims that Dash spontaneously agreed to pay to him a $3500 fee, plus an exorbitant royalty of 2% of the company's sales for 10 years, to draw a new logo.  Walker alleges that Dash eventually signed a one-page, handwritten contract in 1995 setting forth their deal.  However, Walker made no copies of the document, even for Dash; nobody witnessed the signing; and Walker cannot produce this supposed $7 million writing because he, supposedly, "lost" it a few years later.

Based on the foregoing, Walker asserts claims against the Defendants for breach of contract and copyright infringement for their use of his alleged logo design.  Walker is barred as a matter of law from pursing either of his claims.

Walker's contract claim fails as a matter of law because it is barred by the Statute of Frauds and the doctrine of discharge.  The Statute of Frauds dooms Walker's contract claim *ab initio*:  the contract, which could not be performed in one year, has never been produced, and Walker cannot proffer anyone or anything to corroborate its existence or terms.  The *only* witness who claims to know anything about its contents has provided testimony which conflicts with Walker's on virtually every aspect of the supposed writing.  And Walker has offered ever-shifting accounts of when his royalty payment was supposedly due – first claiming it was due 10 years after the contract was allegedly signed; then, 10 years from when Roc-A-Fella used the logo; and, finally, when it became clear that his suit would have been time-barred under either of those scenarios, 10 years after the first year of use – a contrivance that magically transformed his 10-year royalty period into 11.  Under well-established New York law, Walker is barred from relying on this suspect parol evidence to satisfy the Statute of Frauds.

Walker's contract claim is also barred by the doctrine of discharge because Walker has always been incapable of performing his end of the supposed bargain.  Walker contends that upon receiving his lump-sum royalty payment he was obligated to transfer all copyright rights in and to the logo to Roc-A-Fella Records.  Walker, however, now admits that he did not draw any part of the logo design.  As a matter of law, then, Walker never had any copyright ownership in the logo that he supposedly was required to convey; and, thus, he has always been legally incapable of performing under his supposed contract.  As a result, any purported payment obligation by Defendants is discharged as a matter of law.

Walker's copyright claim suffers from at least four similarly fatal defects.  First, his copyright claim is barred by the applicable three-year statute of limitations.  Although Walker has styled his claim as one for copyright infringement, he testified that Defendants repudiated his

2

claim that he created the logo design decades ago, which makes ownership the gravamen of Walker's claim.  Where, as here, the ownership of a copyrighted work is in dispute, the three-year limitations period is calculated from the date on which a reasonably diligent plaintiff would be put on notice that someone else was claiming ownership of the work.  In this case, Walker admits he was aware *as early as 1996* – 16 years prior to the filing of the Complaint – that a Roc-A-Fella employee named Adrien Vargas was credited with the logo design.  Second, Walker lacks standing to maintain his copyright infringement claim.  Walker claimed in his Complaint that he created the logo, and he claimed in his copyright registration application that he owned the design as a work made-for-hire (meaning that someone else created it but that Walker owns the rights as an employer or otherwise).  But the evidence shows that neither is true; by Walker's own admissions, he did not create the work on which he has sued, and he has never obtained ownership of its copyright through anyone else.  Third, from the very first day, Walker says that he intended Roc-A-Fella to use the logo:  his unequivocal statements provide Defendants with an express license to use the logo forever, both during and after the supposed contract term (when all rights were to be transferred to Roc-A-Fella).  This license is an absolute defense to a copyright infringement claim.  Finally, Walker's copyright claim is barred as a matter of law because his copyright registration was procured by fraud, and is thus invalid, because Walker misrepresented that he was the owner of the logo as a work made-for-hire, and because the logo Walker submitted as a deposit copy was not the design he claims he created.

On the undisputed evidence adduced over nearly four years of litigation, it is clear that each of these problems bars Walker's claims as a matter of law.  Accordingly, for any or all of the reasons discussed below, Defendants' motion for summary judgment should be granted.

## FACTUAL BACKGROUND

### A.  The Parties

Defendants Dash, Carter, and Kareem Burke (collectively "the Individual Defendants") are the co-founders of the Roc-A-Fella record label, which they operated through a company named Roc-A-Fella Records, Inc. ("Roc Inc.") (Defendants' Joint Statement of Undisputed Material Facts ("JSF") ¶¶ 1, 3-4.)

Plaintiff Walker is an individual who claims to have interacted with Dash, Carter, and Burke around the time they formed their record label.  (*Id.* ¶ 2.)

Defendant RAF LLC is a limited liability company that was formed in 1997, well after the events at issue allegedly occurred, and which was originally jointly owned by the Individual Defendants and a predecessor of UMG.  (UMG Defendants' Statement of Undisputed Material Facts ¶¶ 161-62.)  UMG purchased the Individual Defendants' interests in RAF LLC, and reorganized the entity as a wholly-owned subsidiary of UMG, in 2004.  (*Id.* ¶ 164.)  At the time Walker's lawsuit was filed, Defendant The Island Def Jam Music Group was an unincorporated division of UMG.  (*Id.* ¶ 169.)

### B.  Walker's Story Regarding The Creation Of The Roc-A-Fella Logo

Walker claims to have met Dash and the other Individual Defendants around the time they were forming Roc. Inc.  (JSF ¶ 2.)  Walker contends that in or around February or March of 1995, he became "something of a consultant to Dash and Roc-A-Fella," because he allegedly helped Dash to "purchas[e] sewing machines" and "brainstorm" ideas for a possible clothing line.  (*Id.* ¶ 7.)  At the time, Walker worked at an AT&T store and as a salesperson for a fashion line.  (*Id.* ¶ 9.)

4

Walker contends that he was "sitting on the couch" at Dash's apartment sometime in the fall of 1995 when he happened to see a "piece of paper" containing a sketch for a proposed logo for Roc-A-Fella Records.  (*Id.* ¶ 8.)  He claims that he looked at the drawing and told Dash that he could "do something better."  (*Id.* ¶ 12.)  Walker had no experience as a graphic designer and "wasn't a great illustrator" (Ex. 8 at 113:24-114:8, 133:22-134:7, 379:4-8),[1] and he did not give Dash any suggestions regarding how he might change or improve the design.  Nevertheless, Walker contends that Dash engaged him to draw a logo, which Dash said should contain "an R, album and a champaign [sic] glass" (Ex. 7 at 49:18-22), and agreed on the spot to pay him $3,500 and an exorbitant royalty of "5 percent of everything that the logo is on" simply to draw the design that Dash had conceptualized.  (*Id.* at 50:2-18.)

Walker initially contended in his Complaint that he was the creator of the logo drawing that he ultimately delivered to Dash.  (Plaintiff's Second Am. Compl. ("SAC") ¶¶ 22-23.) Walker, however, admitted at his deposition that he drew no part of the design; instead, he testified that he gathered three men to draw the elements that Dash told him to draw:  Freddie Mack, whom Walker chose to draw the record album because his "circles come out circular" (Ex. 7 at 61:4-16, 69:8-10);[2] Flavius Panchon, whom he chose to draw the stylized R, even though he "is a little too stiff" and his "drawing didn't have no feel to it" (*Id.* at 61:15-16, 69:5-8); and Kenny Gonzalez, a man who "came out of the blue to draw the champagne bottle " (Ex. 9 at 112:22-113:5).  The men gathered at Panchon's apartment one evening, and Mack, Panchon, and Gonzalez each supposedly drew his individual element on a separate piece of paper, and each left for the night with his own drawing.  (Ex. 7 at 61:4-18, 63:4-18, 65:12-66:6.)  Walker

---

[1] All numerical exhibits in this Memorandum are appended to the Declaration of Cynthia Arato, dated April 1, 2016.
[2] Mack, however, apparently drew the record simply by moving a pen around a saucer or a disk.  (Ex. 7 at 63:6-9; Ex. 9 at 57:14-25.)

further testified that the four men met the next day at a Kinko's, where Gonzalez traced the three drawings onto a single piece of paper.  (*Id.* at 64:4-65:11, 67:3-18.)

### C.    Walker's Story Regarding The Alleged Contract

Walker claims that, when Gonzalez finished tracing the respective drawings, the men left Kinko's and presented the drawing to Dash the same day, but Dash refused to agree to the 5% royalty which Walker claims they previously negotiated.  (JSF ¶¶ 25-26.)  Walker says he met with Dash a few days later, and they renegotiated the deal.  Under the new supposed terms, Walker would be paid $3,500 upfront, and would receive a 2% royalty for a 10-year period, if the logo was used "after the first year of usage."  (*Id.* ¶ 29.)  In exchange, Walker would transfer all rights in the logo once he received his royalty.  (Ex. 7 at 80:11-12.)

Within a "couple of days," Walker met with Dash at a recording studio to deliver the drawing.  (*Id.* at 83:19-24.)  Walker claims that Dash paid him the upfront payment of $3,500 "in singles" out of a "box or a shoe box," which Walker then, incredibly, put "in [his] pocket."  (*Id.* at 83:19-84:16.)  At this meeting, Walker says he found a "white piece of paper like [from] . . . a copy machine" and, then and there, handwrote a contract for Dash to sign.  (*Id.* at 84:22-85:8, 114:25-115:13.)  Walker claims that he and Dash signed this alleged contract, with Dash signing "IN Execution of RocaFella Records."  (*Id.* at 84:22-85:8, 87:2-12; Ex. 12.)  Walker "replica[ted]" the alleged document at his deposition as follows:

> On this DAY OF _____
> I herby Dwayne D. Walker
> agree to accept 3,500 and 2% percent
> For Creating RocaFella Logo.
> In which is payable
> For 10 yrs after 1st year use
> once payment is renderd , I Dwayne D. Walker
> will transfer ownership of Logo Dame Dash
> IN Execution of RocaFella Records
>
> _____
> Dame Dash (Chief Excutive Officer)
> Kaream Biggs Burke
>                                                            _____
>                                                            Dwayne Walker
> S. Carter (JAY-Z)

(Ex. 12 (errors supplied by Walker); *see also* Ex. 7 at 84:22-85:8.)  Walker claims that under

these terms, no royalties were payable to him during the 10-year period in which they

purportedly accrued; instead, Walker claims that the royalties were due in a single lump-sum

payment at the end of the 10-year royalty term.  (Ex. 7 at 121:6-24, 123:2-125:8, 126:7-17,

137:8-10.)  Walker claims that he left the meeting with the only copy of the alleged written

contract, and that Dash left with the only copy of the alleged logo drawing.  (*Id.* at 89:22-90:17.)

Walker claims that he believed he "still ha[d] to get [the contract] in legal terms" on a "lawyer's

legal paper," but that he "didn't make any effort" to do so.  (JSF ¶ 40.)

### D. Walker Is Unable To Corroborate The Contract's Existence And Proffers Testimony That Is Fatally Inconsistent About Its Terms

Walker asserts that he "lost" the only copy of the alleged contract that ever existed no

later than 1998 when he moved to Atlanta, after leaving it in a desk drawer at his uncle's

apartment in Harlem, along with some baseball cards.  (*Id.* ¶¶ 41-42.)

#### 1. Walker has no corroborating evidence of the contract or its terms

Walker has no documents evidencing this supposed written contract.  (*Id.* ¶ 43.)  He

cannot identify anyone who was present at the meeting with Dash when the contract was

allegedly signed and has no witness who saw its signing.  (Ex. 7 at 83:25-84:2, 201:14-23; JSF

¶¶ 44-45.)  Walker also has no witness who can corroborate – with personal knowledge or

otherwise – the supposed terms of his alleged deal.

Walker has proffered Mack, Panchon, and a friend of Walker's, David Sierra, as the only

witnesses who have seen the alleged writing.  Mack, however, testified that he does not recall

ever "seeing a document concerning Mr. Walker being paid for the logo design."  (Ex. 13 at

31:12-17.)  Panchon claims to have seen a document, but he believes "it was a contract" only

"because Mr. Walker said that it was" (Ex. 9 at 81:24-82:3), and he cannot testify as to its terms

because he "didn't focus on" it, and his recollection is thus "blank."  (*Id.* at 79:20-80:3.)  Sierra

claims to have seen the document, although he cannot "remember the specific instance" (Ex. 8 at

190:22-191:14), and even though Walker has denied showing it to him (Ex. 7 at 215:20-23.)

Sierra also contradicts virtually everything Walker has said about the document, including what

it looked like, who signed it, the amount of its upfront payment, the date any royalties were to be

paid, and when the document was supposedly lost.  *See infra* p. 18.

> ### 2. Walker's own inconsistent testimony fails to establish the terms of the alleged agreement

Walker has offered ever-shifting accounts of the date on which his alleged "lump-sum"

payment was due, in a transparent effort to game the applicable statute of limitations.  On May

25, 2010, two years before he filed suit, Walker sent a demand letter to defendants seeking over

$7 million in royalties under his purported agreement.  (Ex. 19.)  The letter was written by

Walker's former counsel, a partner at the law firm Kasowitz Benson Torres & Friedman LLP.

(*Id.*; JSF ¶ 68.)  The letter contended that, under the supposed contract, Walker was entitled to:

> an initial payment of $3,500, upon submission of the artwork to Roc-A-Fella, and
> a royalty equal to two-percent of sales of all products and services using the logo,
> *payable 10 years **after the execution of the contract**.*

(Ex. 19 at WALKER-00014.005 (emphasis added).)  Walker's then-counsel re-affirmed these

terms in a subsequent letter and an email sent to a UMG executive.  (JSF ¶ 71; *id.* ¶ 72 ("The

terms of the agreement are set forth in my original correspondence dated May 25, 2010, to Mr.

Ostroff and others.").)

      At his deposition, Walker admitted that "all the information" contained in this letter was

based on information he personally had told his lawyer; that he reviewed the letter before it was

sent; and that "everything" in it was "accurate."  (Ex. 7 at 149:24-149:8; 150:14-21.)  Walker

also admitted, *in response to his current lawyer's questioning*, that his prior lawyer's statement

was "an accurate description of the contract":

> Q.      The third line it says "The contract signed by Mr. Walker".
> A.      "The contract signed by Mr. Walker and Mr. Dash on the behalf of Rock-A-Fella [sic] Records provided for initial payment of $3500 upon submission of artwork to Roc-A-Fella and the royalty equal to 2 percent of sale of all products and services using the logo payable 10 years after the execution of the contract."
> Q.      Is that an accurate description of the contract?
> A.      Yes.

(*Id.* at 289:7-18.)

      A few months later, Walker sent a series of emails to Carter's business lawyer claiming

that the royalty was payable 10 years after use of the logo.  In one email, Walker asserted that the

royalty payment was due "after ten years of use.! . . . 3500 paid!!  2 percent DUE!  *1995 payable*

*2005*.!! [sic]"  (Ex. 23 (emphasis added).)  In another, he claimed "2pct Of everything my

intellectual property was on after its tenth year of use."  (Ex. 22.)  And in a third, he repeated

"2percent after ten years!"  (Ex. 24.)  As with his lawyer's letter, Walker admitted at his

deposition that the information in these emails was also "true and accurate."  (Ex. 7 at 162:16;

*see also id.* at 292:6-293:3 (testifying, in response to his own lawyer's question, that Ex. 22 "is

correct, after the 10th year of use").)

As explained below, under either of these timetables, each of which provide for one lump-sum payment at the end of 10 years, Walker could have brought a lawsuit in 2010 – well within New York's six-year statute of limitations for contract claims. *See infra* p. 21. Walker, however, waited until July 2012 to bring this action. (Dkt. Nos. 4-7.) By then, his contract claim was plainly time-barred under either of the above two formulations. Accordingly, Walker (and/or his current counsel) conjured up yet another payment term to put in his Complaint: that the alleged royalty payment was due after 10 years *after the first year* of Roc-A-Fella's use of the logo (*see* Ex. 7 at 121:6-24, 123:2-125:8, 126:12-21.), or, in other words, after 11 years.

### E.  Defendants Dispute Walker's Ownership And Creation Of The Logo, And Walker Has Been On Notice Of This Dispute Since 1996

Defendants have always taken the position that Adrien Vargas, not Walker, created the Roc-A-Fella logo. Vargas was hired as Roc-A-Fella's Art Director in 1995, and he provided compelling testimony in this case that he created the Roc-A-Fella logo. (JSF ¶¶ 96, 100-14.) At his deposition, Vargas recounted in detail his drawing of, and inspirations for, this design. (*Id.* ¶¶ 101-04, 108-11, 113.)[3] He also produced in this case his contemporaneous sketchbooks, which he saved all these years, along with other mementos of his work, and which reflect his "thoughts," "doodles," "ideas," and "exploration[s]" of the various elements for the logo design. (*See* Ex. 26; Ex. 27; JSF ¶¶ 105-06.)

Vargas testified that he created three iterations of the logo. (JSF ¶ 107.) His first, rough version of the logo appeared on a business card for Dash, and on a promotional pre-release copy (called a "white label") of Carter's first single *Dead Presidents*. (*See* Ex. 28; Ex. 29; JSF ¶¶ 108-09.) His second, more refined version of the logo appeared on the commercial release for *Dead*

---

[3] For example, Vargas testified that that he placed a "little symbol" that "looks like the letter J" inside the champagne bottle as "a nod to" Carter. (Ex. 5 at 17:18-23, 45:19-25.) Walker testified, inexplicably, that this symbol is an "upside down" "question mark" which "represent[s] who Jay is, where Jay came from. You know, what doe[s] [ ]he do." (Ex. 7 at 20:2-11, 67:21-24, 68:19-23.)

*Presidents*.  (Ex. 30; JSF ¶¶ 111-12.)  A third and final version first appeared on Carter's debut full-length album *Reasonable Doubt*.  (Ex. 31; JSF ¶¶ 113-14.) [4]

Walker testified that when *Reasonable Doubt* was released in 1996, he noticed that "his" logo design had been altered, and that the album had credited "Adrien Vargas" with "Art Direction."  (Ex. 7 at 166:7-167:10; Ex. 14 at 387:10-389:17; *see also* Ex. 31.)  Walker claims that he became "furious" when he noticed the changes and the credit because he knew it meant that Roc-A-Fella "was going to deny that [he] had a right to this design."  (Ex. 14 at 388:24-389:17.)  Walker further claims that he called Roc-A-Fella's offices on more than one occasion and personally complained to both Dash and Vargas.  (Ex. 7 at 167:4-168:16 (Walker claims he told Dash "you put artwork done by Adrien Varg[a]s.  People look at that they are going to assume that he did the logo.  Give me my credit"); *see also id.* at 170:3-172:21.)  Walker, however, did nothing to assert his copyright interest at that time or for the next 10 years, including in 2005, 2006, or 2007, the various times he claims his alleged 2% lump-sum royalty payment was due.

### F.    Walker's Invalid And Fraudulent Copyright Registration And Deposit Copy

Walker filed for a copyright registration in April 2010 – 14 years after he became aware that Roc-A-Fella had credited Adrien Vargas with the design, and over 13 years after Roc Inc. filed for a trademark registration in the logo, thereby claiming exclusive nationwide ownership rights to the design and its attendant goodwill.  (Ex. 32; Ex. 7 at 179:22-180:8; *see also* JSF ¶¶

---

[4] Walker claims that his group designed only the more refined logo that appears on the *Dead Presidents* commercial release and not the more rudimentary version that appeared earlier in time on that recording's white label (and on Dash's business card).  (Ex. 7 at 165:22-166:6, 169:2-8.)  Walker would have this Court believe that he gave Dash the more refined logo that appears on the *Dead Presidents* commercial release *before* the white label release of that recording and that someone took his design and worked backwards to make it more rudimentary and unrefined for the white label and for Dash's business card, before using it "as is" for the *Dead Presidents* commercial release, and then refining in the other direction for the *Reasonable Doubt* album.  (*Id.* at 173:8-177:15; Ex. 14 at 363:10-14, 427:15-428:2.)

125-26.)  Walker's attorney at Kasowitz prepared his copyright registration application, and Walker reviewed and signed it under penalty of perjury.  (Ex. 7 at 180:9-181:5; Ex. 32 at WALKER-00014.031.)  Walker now concedes that the application contained two material misrepresentations.

First, Walker submitted a deposit copy of the logo design with his application (the "Deposit Copy"), which he admits "was not the original drawing he gave to Mr. Dash in 1995" (Ex. 32 at WALKER-00014.033; Ex. 7 at 196:20-197:3), and is not an accurate copy of "his" logo drawing, as demonstrated in more detail in Section VI.A, *infra*.

Second, Walker's copyright application misrepresented that he had rights in the logo design.  The application represents that the logo was "Made for hire," meaning that Walker was purporting to be the "employer for hire" of the alleged work done by Gonzalez, Panchon, and Mack.  (Ex. 32 at WALKER-00014.027; *see supra* pp. 5-6.)  But Walker admitted at his deposition that Gonzalez, Panchon, and Mack "didn't work for [him]," that they were only "independent contractors," and that he signed no documents with them regarding the logo design or how their work would be treated.  (Ex. 7 at 132:22-134:8, 203:15-204:3; *see also* Ex. 13 at 22:2-16, 32:13-25; Ex. 9 at 111:16-112:17; JSF ¶¶ 92-94.)

## ARGUMENT

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claims," *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996), and summary judgment should be awarded if the opposing party

fails to come forward with "evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial." *United States v. Rem,* 38 F.3d 634, 643 (2d Cir.1994); *accord Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015) (same).  Granting summary judgment in this setting serves "[o]ne of the principal purposes of the summary judgment rule[, which] is to isolate and dispose of factually unsupported claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), so that the moving party may "avoid[] protracted, expensive and harassing trials."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WALKER'S CONTRACT CLAIM

Defendants are entitled to summary judgment on Walker's contract claim for two independent reasons.  First, Walker's contract claim fails because Walker cannot produce his supposed "lost" contract, and he has no competent evidence sufficient to satisfy the Statute of Frauds.  Second, any purported obligation of Defendants to pay royalties under the alleged agreement has been discharged, as Walker was, at all times, unable to perform his obligation under the alleged contract.

### A.   Walker's Contract Claim Is Barred By The Statute of Frauds Because He Cannot Prove The Existence Or Terms Of His Supposed "Lost" Contract

#### 1.   The varying standards to prove a lost writing[5]

The New York courts have long recognized that the purpose of the Statute of Frauds is to prevent enforcement of an agreement that was never made.  As the New York Court of Appeals recently reaffirmed, the Statute of Frauds:

> is designed to protect the parties and preserve the integrity of contractual agreements.  More precisely, the statue is meant to guard against the peril of perjury [and] to prevent the enforcement of unfounded fraudulent claims.  The

---

[5] It is undisputed that the alleged contract is incapable of being performed within one year, and is thus unenforceable unless Walker can satisfy the writing requirement of the Statute of Frauds.  N.Y. G.O.L.§ 5-701(a) & (a)(1).

statute decreases uncertainties, litigation, and opportunities for fraud and perjury and primarily discourages false claims. *In short, the purpose of the Statute of Frauds is simply to prevent a party from being held responsible, by oral, and perhaps false, testimony, for a contract that the party claims never to have made.*

*JF Capital Advisors, LLC v. Lightstone Grp., LLC*, 25 N.Y.3d 759, 764-65 (2015) (emphasis added) (internal quotation marks and citations omitted).

The New York Court of Appeals has not opined on what parol evidence a plaintiff may use to prove up a "lost" writing that is subject to the Statute of Frauds, and the Appellate Divisions have set forth different requirements. This Court, however, need not resolve which requirement should apply because Walker cannot satisfy any of them.

In the Third Department, for example, a plaintiff is barred from offering *any* parol evidence to prove a lost contract, save for a party admission. The Third Department adopts this prohibition because allowing a plaintiff to use oral testimony to satisfy the Statute of Frauds eviscerates the rule:

> Except where the party invoking the protection of the Statute of Frauds admits the unproduced agreement was indeed entered into, the Statute of Frauds shelters certain transactions from the uncertainty of witness memory and the danger of fraud by immunizing them from parol evidence. Allowing the terms of a lost writing covered by the Statute of Frauds to be proven by parol evidence, when the writing's very existence is suspect, would undermine the statute's rationale, for such evidence is no more reliable than parol evidence of an oral agreement.

*Matter of Talco Contractors v. N.Y. State Tax Comm'n*, 140 A.D.2d 834, 835 (3d Dep't 1988) (citations omitted).

Similarly, the First Department has also allowed the use of a party admission to prove the existence of a lost contract. *See Dependable Lists, Inc. v. Malek*, 98 A.D.2d 679, 680 (1st Dep't 1983) (plaintiff could rely on defendant's concession "in his examination before trial . . . that such a written agreement did in fact exist"). However, the court in *Malek* noted in that case that

14

the *defendant* possessed the only copy of the document before it was lost, *id.*, and the First Department has not ruled on the use of such an admission outside that setting.[6]

In the Fourth Department, a plaintiff may prove a lost writing through (1) "the admission of an adversary," or (2) "the testimony of others *who have first-hand knowledge of the existence of the writing and its terms*," at least when the failure to produce the original is adequately explained. *Nicosia v. Miller*, 229 A.D.2d 964, 965 (4th Dep't 1996) (emphasis added) (allowing use of deposition testimony and affidavit of attorney who observed defendants' decedent sign three copies of alleged agreement and setting forth details of agreement).

The Second Department has allowed the use of parol evidence when such evidence included all of the above *as well as* corroborating documentary evidence, and also when a party's former lawyer testified to the existence and terms of the document. *See Lynch v. Savarese*, 217 A.D.2d 648, 650 (2d Dep't 1995) (approving reliance on testimony of third-party witness who observed signing of lease, where contemporaneous copy of unsigned writing existed in the record, and defendant admitted that the unsigned document looked like the lease he had signed); *Wilson v. Wilson*, 37 A.D.3d 594, 595 (2d Dep't 2007) (citing *Nicosia* and *Lynch*, *supra*, and allowing testimony of former attorney of party to alleged agreement).

No New York court allows a plaintiff who allegedly lost the document in dispute to prove its existence using his own self-serving testimony. In *Horizon Inc. v. Wolkowicki*, the New York Supreme Court granted summary judgment in a Statute of Frauds case where the "only proof of the contents of" an alleged written promissory note was the "self-serving testimony" of the

---

[6] Other cases have allowed various forms of parol evidence where the ***defendant*** was the sole party that possessed the document in dispute. *See Lapidus v. N.Y.C. Chapter of N.Y. State Ass'n for Retarded Children*, 118 A.D.2d 122, 126 (1st Dep't 1986) (testimony of plaintiff coupled with admission of defendant's agent that he negotiated agreement, and internal memoranda reflecting existence of contract and its terms); *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (testimony of escrow agent responsible under the agreement for holding promissory notes). Those cases do not help Walker because he testified that he possessed the "only copy of the [alleged] contract." (Ex. 7 at 90:12-17.)

plaintiffs' principal.  No. 0600305/2005, 2008 WL 279228 (N.Y. Sup. Ct. Jan. 15, 2008).  The First Department affirmed, holding that the lower court "properly refused to consider th[e] parol evidence" of "the testimony of [plaintiffs'] agent . . . as to the contents" of the missing contract. *Horizon Inc. v. Wolkowicki*, 55 A.D.3d 337, 338 (1st Dep't 2008).

The New York courts have also recognized that a plaintiff cannot prove up a missing document where a plaintiff or his witnesses provide inconsistent accounts of the supposed document's contents.  *See, e.g.*, *Talco*, 140 A.D.2d at 835 (even if plaintiff could "circumvent the writing requirement with secondary evidence," plaintiff "has failed to satisfactorily prove the content of the missing security agreement" where the evidence "provide[s] incongruous descriptions of the covered collateral"); *Deeb v. Int'l Radiant Corp.*, 21 Misc. 2d 340, 341-42 (Sup. Ct. 1959) (evidence insufficient to establish terms of lost contract where witness who prepared "a reconstruction of the contract . . . from memory" "testified to a different agreement than his own reconstruction in some important respects").[7]

### 2.   Under any formulation of the Statute of Frauds, Walker offers no competent witness testimony regarding his supposedly lost contract

This Court need not reconcile the various Appellate Division approaches to the parol evidence question in lost contract cases, or even choose among them, because Walker's claim fails under all of the above tests.  Walker has *no* admission by any Defendant that his supposed writing ever existed (JSF ¶ 67); *no* documents evidencing his supposed written deal, *i.e.,* no contemporaneous notes, drafts, subsequent royalty statements, or other such writings (*id.* ¶ 43); *no* witness who saw the supposed agreement being signed; and *no* witness with personal knowledge of the agreement's supposed terms.

---

[7] It is an open question whether a plaintiff seeking to prove a lost contract subject to the Statue of Frauds must prove the contract by a preponderance of evidence or with clear and convincing evidence.  *See infra* Section II.A.4.  Although this Court should apply the clear and convincing standard, this Court need not resolve this question, as Walker cannot meet either evidentiary burden.

Despite this lack of competent evidence, Walker apparently intends to rely on the testimony of Mack, Panchon, and Sierra to "prove" both the existence and terms of his contract. None of the three, however, can satisfy Walker's burden of proof.  It is undisputed that none of them (1) was present when Walker allegedly met with Dash at the recording studio and asked him for a signed writing or when Dash allegedly signed the document; or (2) helped procure the writing (assuming, *arguendo*, that this could suffice).  (Ex. 7 at 83:25-84:2, 201:14-23; Ex. 9 at 81:13-82:3; Ex. 8 at 208:14-16; Ex. 13 at 31:12-17.)  Thus, their testimony falls far short of the first-hand knowledge allowed by New York courts.  *See, e.g.*, *Nicosia*, 229 A.D.2d at 965 (affidavit of lawyer who saw agreement being signed and recounted its terms); *Lynch*, 217 A.D.2d at 650 (affidavit of former managing agent of leased premises who personally observed signing of lease); *829 Post LLC v. Town of Eastchester*, No. 20672/05, 2007 WL 6782235 (N.Y. Sup. Ct. Sept. 7, 2007) (affidavit of "non-party witness" who "negotiated the lease agreement").

Mack has no knowledge of the agreement or its terms – personal or otherwise – because he does not recall ever "seeing a document concerning Mr. Walker being paid for the logo design."  (Ex. 13 at 31:3-17.)  Although Panchon claims to have seen a document, he admitted that the "the only reason" he believes it was a contract was because Walker said so, and all he can say about its terms is that "all of that is blank."  (Ex. 9 at 81:24-82:3, 79:20-80:3.)  Accordingly, Panchon lacks personal knowledge of the contract's existence or its terms.

Sierra is the only witness who claims to have any specific knowledge about the alleged document.  He claims to have recognized Dash's signature on the purported contract – after allegedly seeing it only once – because he also allegedly had seen Dash's signature, again only once, on a lease (Sierra, however, cannot recall the details of either viewing).  (JSF ¶¶ 57-58, 65.)  This purported single, post-hoc viewing of the alleged contract is a far cry from the type of

17

first-hand knowledge – *i.e.*, witnessing a signing or, arguably, negotiating the terms – which courts have found can satisfy the Statute of Frauds. *See, Nicosia*, *Lynch*, *829 Post*, *supra*. Sierra's testimony is thus inadequate to create a genuine issue of fact regarding the existence of the alleged agreement.

Sierra's testimony also conflicts with Walker's on virtually every aspect of the alleged contract, including what it looked like, what it said, who signed it, and when it was lost:

- Walker testified that the alleged contract required an upfront payment of $3,500. (Ex. 12; Ex. 7 at 84:22-85:8.) Sierra testified that the document he saw provided for 10 times that amount, or $35,000. (Ex. 8 at 174:5-15, 177:12-20.)

- Walker testified that the alleged contract provided for royalties to be paid in one lump sum after a 10-year period beginning after the first year of Roc-A-Fella's use of the logo and contained no specific calendar payment date. (Ex. 7 at 121:6-24, 123:2-125:8, 126:12-21, 137:8-10; Ex. 12.) Sierra testified that "there was one" date on the contract providing for when the royalties were due; that he "read [2007] on the contract," and that he "for sure" saw the year 2007 on the contract. (Ex. 8 at 420:18-24, 427:9-11; *see also id.* at 198:17-22, 439:9-11.)

- Walker testified that he *and* Dash signed the alleged one-page contract. (Ex.7 at 87:2-12.) Sierra testified that only Dash's signature appeared on the page. (Ex. 8 at 199:4-200:3 (testifying "Why would Mr. Walker need to sign it?").)

- Walker claims that the contract was written on a "white piece of paper like you would use . . . from . . . a copy machine." (Ex. 7 at 114:25-115:13.) Sierra testified that the document had "lines on the paper." (Ex. 8 at 200:24-25.)

- Walker testified that he lost the alleged contract no later than 1998, when he moved and left it at his uncle's apartment. (Ex. 7 at 102:4-6; 90:22-91:4, 91:20-23, 92:11-17.) Sierra testified that Walker carried the contract around in a white binder for "five to 10 years" after its execution and that he saw it at least as late as 2000. (Ex. 8 at 178:14-179:2, 95:17-96:17.)

- Walker testified that he spontaneously handwrote the agreement in the recording studio the day that Dash allegedly signed the document. (Ex. 7 at 84:22-8.) Sierra testified that Walker showed him an unsigned draft of the document before the day it was allegedly signed. (Ex. 8 at 172:24-178:9.)

These inconsistencies make it impossible, as a matter of law, for Sierra to corroborate Walker's claim. *See*, *e.g.*, *Talco*, 140 A.D.2d at 835; *cf. Deeb*, 21 Misc. 2d at 341-42. Under

even the most permissible of the Appellate Division standards, Sierra's testimony would be

competent evidence of Walker's alleged lost contract only if he has "first-hand knowledge of the

existence of the writing *and its terms*."  *Nicosia*, 229 A.D.2d at 965 (emphasis added).  Not only

does Sierra lack the requisite first-hand knowledge, but the terms to which he testified are so

wildly inconsistent with Walker's purported recollection that it is impossible to conclude that the

two are describing the same document.  Indeed, given that goal of the Statute of Frauds is to

"shelter[] certain transactions from the uncertainty of witness memory and the danger of fraud,"

*Talco*, 140 A.D.2d at 835, and to "prevent a party from being held responsible, by oral, and

perhaps false, testimony, for a contract that the party claims never to have made," *JF Capital*, 25

N.Y.3d at 765 (internal quotation marks omitted), Walker cannot be allowed to circumvent that

law with such conflicting and fundamentally inconsistent testimony.[8]

### 3.   Walker's own inconsistent testimony also forecloses his contract claim, under any of the Appellate Division rules.

Walker's own internally inconsistent accounts of the terms of his supposed agreement

independently doom his claim and further highlight the importance of the Statute of Frauds to

this case.  *See, e.g., Talco*; *Deeb*, *supra*.  Indeed, since 2010, Walker has proffered *three different*

*versions* of when his royalties were due:  10 years after execution of the purported contract; 10

years after use of the logo; and 10 years after *the first year* of use.

---

[8] Sierra's testimony is emblematic of the fraud that the Statute of Frauds is designed to prevent.  On June 12, 2014, Walker testified that (1) he had never shown the alleged contract to anyone other than Mack, Panchon, and Gonzalez; and (2) Sierra had no personal knowledge about this case except for Walker's interactions with Damon Dash regarding Dash's "vision for [a] clothing line."  (Ex. 7 at 215:20-23, 258:10-259:13.)  On July 7, 2014, after Mack and Panchon were deposed and admitted that they had no personal knowledge of Walker's alleged contract, Defendants submitted a pre-motion conference letter to this Court explaining that Walker's contract claim was barred by the Statute of Frauds because Walker had no evidence beyond his own self-serving testimony.  (*See* Dkt. No. 97 at 2.)  It was only *after* Defendants submitted that letter that Walker obtained an affidavit from Sierra, drafted by Walker's counsel, claiming that Walker had shown him the purported signed contract.  (Dkt. No. 114-1 ¶ 31; Ex. 8 at 322:20-23.)  When Sierra was deposed on April 13, 2015, however, he admitted that he never saw a signed version of any alleged contract between Dash and Walker.  (Ex. 8 at 183:18-25.)  He then recanted this testimony after Walker's counsel (who also represents Sierra) reminded him on a lunch break of the declaration that the lawyer had written and that he had signed.  (*Id.* at 186:12-187:2.)

Walker advanced his initial formulation through the 2010 letter that his first lawyer wrote based on information that Walker had supplied to him.  (Ex. 19; Ex. 7 at 150:14-21.)  Walker reviewed the letter before it was sent, and he confirmed its accuracy at his deposition.  (Ex. 7 at 148:24-149:8, 289:7-18.)  Walker repeated his second formulation three times in various emails he sent to Carter's counsel that same year, with double and even triple exclamation points for emphasis (*see* Ex. 22; Ex. 23; Ex. 24), and he confirmed their accuracy at his deposition as well.  (Ex. 7 at 161:10-162:16, 292:6-293:3.)  Walker provided his third formulation when he filed this lawsuit in July 2012, when he claimed that the royalty was due only 10 years *after the first year of use* – a convoluted term that results in a payment 11 years after use.  (*See* Ex. 7 at 121:6-24, 123:2-125:8, 126:7-17; SAC ¶¶ 19-20.)

Walker's payment terms cannot be reconciled with each other or even with his alleged writing.  When asked to "replica[te]" the contract at his deposition, Walker wrote that his royalty was "payable for 10 years after 1st year of use."  (Ex. 12; Ex. 7 at 86:14-21.)  Nothing in that phrasing provides, or even suggests, that the royalties were payable only at the end of that 10-year period, and not annually, as is customary.  Walker even testified that "[i]t wasn't specified between [him] and Dash exactly when a check had to go out the door."  (Ex. 7 at 126:7-11.)  Each of his alternative formulations results in a completely different payment date of, variously, December 2005, March 2006, or March, 2007, or some unspecified time(s) during the royalty term.

Allowing Walker to now contend that his purported royalty is payable only 10 years after the first year of use of the logo (and not 10 years after execution or 10 years after use) would offend the policies the Statute of Frauds is meant to serve, and would present the same risk of fraud as testimony about an oral contract.  *See Talco*, 140 A.D.2d at 835.  Indeed, this case is a

prime example of why the Statute of Frauds exists.  Walker is attempting to hold Defendants

liable under a contract that he claims was signed more than 20 years ago, but which Defendants

dispute ever existed.  At best, Walker cannot clearly remember the terms of this alleged

agreement; at worst, he is misrepresenting them to get an undeserved payment and avoid the

statute of limitations bar.

Indeed, Walker did not file this lawsuit until July 2012, and by then his contract claim

was time-barred under either of the payment terms that he and his former lawyer had espoused in

2010.[9]  If he had included either of those two formulations in his pleading, he would not have

been able to file this lawsuit.  Accordingly, he and his current counsel abandoned both of

Plaintiff's prior accounts and conjured up an even more bizarre and convoluted payment term

that extended the supposed payment deadline by one additional year and allowed him to claim

that the lawsuit was timely when he filed it in July 2012.

In this setting, the concern that Defendants could be "held responsible, by oral, and

perhaps false, testimony for a contract that [they] claim[] never to have made" could not be more

stark.  *JF Capital*, 25 N.Y.3d at 765 (internal quotation marks omitted).  Given Walker's own

internally inconsistent account of his contract's supposed terms and the conflicting testimony by

the only supposedly "corroborating" witness, allowing his claim to proceed would render the

Statute of Frauds meaningless in the very scenario for which it was intended.  If this case is

allowed to proceed, any plaintiff could come to court years after the fact, avow that he had a

signed writing and kept the only copy, but subsequently "lost" it; then, extract nuisance value

---

[9] Walker contends that his alleged contract was signed in December 1995 (Ex. 7 at 287:15-17) and that his alleged logo was first used in March 1996.  (*Id.* at 165:22-166:6, 169:2-8.)  Accordingly, when Walker demanded payment in 2010, Walker's contract claim was timely under either of his first two formulations.  If the royalty was due in one lump sum 10 years after execution (Walker's first formulation), it would have been payable in December 2005, and Walker would have had only until December 2011 to sue.  *See* N.Y. CPLR § 213(2) (six-year limitations period for contract claims).  If it was due 10 years after use (Walker's second formulation), it would have been payable in March 2006, and Walker would have had only until March 2012 to sue.

settlements or, like here, subject the defendants to years of "protracted, expensive and harassing" litigation, *Meiri*, 759 F.2d at 998, based on his own self-serving oral account of the contents of a document that he claims no longer exists (and which likely never existed).

4.      **Walker cannot prove his contract with clear and convincing evidence**

As set forth above, Walker is incapable of satisfying the Statute of Frauds under any standard and regardless of his evidentiary burden.  He is clearly incapable of satisfying it under a clear and convincing evidentiary standard, which this Court should adopt.

Although the evidentiary burden for a lost contract that is subject to the Statute of Frauds is an open question in New York, various New York courts have adopted the clear and convincing standard for proving other lost instruments.  *See La Capria v. Bonazza*, 153 A.D.2d 551, 552-53 (2d Dep't 1989) (deed); *Sadow Poskin Realty Corp.*, 63 Misc. 2d 499, 504 (Sup. Ct. 1970) (same); *Boyce Thompson Inst. For Plant Research, Inc. v. Ins. Co. of N. Am.*, 751 F. Supp. 1137, 1140 (S.D.N.Y. 1990) (insurance contract); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 329 & n.90 (S.D.N.Y. 2003) (work-for-hire document).

Courts have adopted this heightened evidentiary burden to avoid the same type of fraud that the Statute of Frauds seeks to prevent.  In *Sadow*, for example, the court ruled against a party who failed to prove a lost mortgage by "clear and certain evidence" because absent such proof, "the claim founder[ed] on the insurmountable statutory obstacle which renders void a mortgage which is neither in writing nor subscribed by the mortgagor" – *i.e.*, the Statute of Frauds.  63 Misc. 2d at 504-05.  Similarly in *Oursler v. Armstrong*, the Court of Appeals imposed a "clear evidence" standard for wills because "regardless of whether the Statute of Frauds controls this case, as quite possibly it does not, *the spirit of it* as well as the decisional law requires clear evidence of the existence of a promise of this nature."  10 N.Y.2d 385, 389 (1961) (emphasis

added) (citations omitted); *see also Edwards v. Noyes*, 65 N.Y. 125, 127 (1875) ("Parol evidence

to establish the contents of a lost deed should be clear and certain. . . . If anything less than these

requirements would suffice, evil practices, which it was the object of the statute of frauds to

prevent, would be encouraged.").  Accordingly, the clear and convincing standard should apply

to proof of lost contracts subject to the Statute of Frauds.

Walker's self-contradictory testimony, as well as Sierra's conflicting accounts, makes it

impossible for Walker to prove his alleged agreement by clear and convincing evidence.[10]  *See*

*Sandoro v. 9274 Grp., Inc.*, 114 A.D.3d 1276, 1277 (4th Dep't 2014) ("confusing and conflicting

deposition testimony" about what a letter may have referred to made it impossible as a matter of

law for plaintiff to prove adverse possession claim by "by clear and convincing evidence"); *see*

*also Kline v. Home Depot Inc.*, No. RDB-08-990, 2009 WL 2246656, at *8-9 (D. Md. July 27,

2009) (plaintiff's internally conflicting deposition testimony could not "create an issue of

material fact" on fraud claim subject to clear and convincing standard); *BDT Prods., Inc. v.*

*Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 896-97 (E.D. Ky. 2003) (where plaintiff's principal

"contradicted himself" regarding one of the key provisions of an alleged lost document, plaintiff

could not "establish the existence of contents of the lost . . . agreement by 'clear and satisfactory'

proof").

**B.    Any Alleged Breach Of Contract By Defendants Was Discharged Because**
**Walker Has Never Been Able To Perform Under The Alleged Contract**

Walker's contract claim is also barred because any obligation to pay royalties was

discharged by his inability to perform his end of the supposed bargain. "As a general principle,

the mutual inability or unwillingness of the parties to a contract to perform will discharge the

---

[10] "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of
the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Accordingly, "the
clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions." *Id.*
at 255.

duty of each to the other."  Williston on Contracts § 43:31 (4th ed.); *accord Donerail Corp. N.V. v. 405 Park LLC*, 30 Misc. 3d 1221(A), at *5 (Sup. Ct. 2011), *aff'd*, 100 A.D.3d 131 (1st Dep't 2012).  Where a contract contains "concurrent conditions, it is a condition of each party's duties that the other party either render performance or, *with manifested present ability to do so*, offer performance of his part of the exchange."  *Schober v. Hudson Valley Humane Soc'y for Prevention of Cruelty to Animals, Inc.*, 89 A.D.3d 715, 717 (2d Dep't 2011) (emphasis added); *see also* Restatement (Second) Contracts § 238 (same). Thus, it is a "maxim of contract law that a party's duty to pay damages is discharged if it appears that the other party would have been totally unable to perform its obligations under the contract."  *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002); *see also Donerail*, 30 Misc. 3d at *5 ("[I]f neither party performs or tenders performance, the duty of neither party becomes due . . . and neither party can be in breach . . . despite the fact that each party has failed to perform as promised." (quoting Williston § 43:31)).

By the terms of Walker's purported contract, he was obligated to "transfer ownership" of the logo to Roc-A-Fella in exchange for his supposed royalty payment.  (Ex. 12; *see also* Ex. 7 at 80:11-12 (Walker told Dash "[o]nce you pay me I will transfer [the logo] over to you.").) Walker, however, has never had the ability to transfer ownership of the logo drawing to Roc-A-Fella (or anyone else) because, as discussed in Section IV, *infra*, he has never owned any part of it.  At the time his supposed royalties were allegedly due, Walker was thus legally incapable of transferring the rights to the logo and had no "manifested . . . ability" to perform his end of the alleged contract.  *See Schober*, 89 A.D.3d at 717.  For this reason, Defendants are discharged from any obligation to pay him the royalties he now claims, and his breach of contract claim fails as a matter of law.

III.   **WALKER'S COPYRIGHT CLAIM IS BARRED BY THE THREE-YEAR STATUTE OF LIMITATIONS BECAUSE HIS DISPUTED OWNERSHIP OF THE LOGO IS THE DISPOSITIVE ISSUE**

Although Walker's copyright claim is "styled as an infringement claim, the gravamen of [his] complaint is that he is the owner of the" copyright in the logo. *Brand v. RMM*, No. 10 Civ. 0287 (AJP), 2011 WL 1496344, at *3 (S.D.N.Y. Apr. 18, 2011). His ownership claim, however, is untimely under the Copyright Act's three-year statute of limitations, and it is well-established that, when an ownership claim is time-barred, "any attendant infringement claims must [also] fail." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (copyright claim framed as infringement was time-barred because dispute really involved whether plaintiff's "editorial contributions" to book were sufficient to qualify her as author and therefore owner of copyright).

Walker's "infringement" claim does not "involve the nature, extent or scope, of copying." *Id.* Rather, it is "rooted in [his] contested assertion of ownership in the copyright" to the logo. *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016). By Walker's own account, Defendants have never conceded Walker's ownership of the copyright in the logo, and, in such cases, "copyright ownership, and not infringement, is the gravamen of the plaintiff's claim to which the statute of limitations is applied." *Ortiz v. Guitian Bros. Music Inc.*, No. 07 Civ. 3897, 2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29, 2008). Walker's pleading confirms this point, as his "infringement" allegations focus on his purported creation and continual ownership of the logo (*see* SAC ¶¶ 64, 66) and his "public[] declaration" of his ownership of the logo (*id.* ¶ 67). Walker's deposition testimony corroborates his focus on ownership rather than copying. For instance, he testified that he called Vargas and Dash to complain that people were "going to assume that [Vargas] did the logo" and demanded that Dash "[g]ive me my credit." (*E.g.*, Ex. 7

at 167:14-168:2; *see also id.* at 76:23-77:5 ("That is my copyright.  My intellectual property right.  Nobody would have been able to put that thought out if I didn't do that.").)

Ownership claims must be commenced "within three years after the claim accrued," 17 U.S.C. § 507(b), *Kwan*, 634 F.3d at 228, and unlike infringement claims, they "accrue[] only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  *Kwan*, 634 F.3d at 228 (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992)).  For example, "a claim can accrue: when a book is published without the alleged co-author's name on it; . . . or when alleged co-owners learn they are entitled to royalties that they are not receiving."  *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013).  Walker testified to at least two such occasions, both of which occurred well over three years before he filed this lawsuit.

First, Walker admitted that he was on notice that his ownership of the copyright in the logo was in dispute as early as 1996.  He admits that he knew Defendants "were going to deny that [he] had a right to his design" at the time *Dead Presidents* was released in 1996.  (Ex. 14 at 388:24-389:17.)  Walker also testified that he discovered that his authorship was being denied "whenever 'Reasonable Doubt' came out" (Ex. 7 at 170:19-22), which was also in 1996 (Ex. 35; Ex. 36.)  Walker claims that, at that time, he noticed changes to the logo design as used in connection with *Dead Presidents* and *Reasonable Doubt* and that he noticed the CD for *Reasonable Doubt* credited Vargas with art direction, and therefore that people would "assume that [Vargas] did the logo."  (Ex. 7 at 166:7-167:10, 167:23-168:2; Ex. 14 at 387:10-389:21.)  As noted above, Walker testified that he called Vargas at the time to dispute Vargas's claim on the logo (Ex. 7 at 167:4-168:16, 171:13-19 ("I basically was like, yo, Adri[e]n, how could you say you did the logo.  I did the logo."), and complained to Dash that crediting Vargas with the

"artwork" of the *Reasonable Doubt* release would lead people to "assume that [Vargas] did the logo." (*Id.* at 167:23-168:2; *see also id.* at 172:10-21.)  Accordingly, Walker was aware that Roc-A-Fella was repudiating his claimed ownership of the logo 16 years before he filed his complaint.

In any event, Walker admits that he would have been aware of a repudiation of his copyright ownership by no later than 2007 – five years prior to filing his complaint.  Regardless of whether his royalty payment was due in 2005, 2006, or 2007, *see supra* pp. 8-9, he admits that he was never paid at any of those times, or ever.  (SAC ¶ 61); *see Friedrich Enters.*, 716 F.3d at 317 (ownership claim accrues "when alleged co-owners learn they are entitled to royalties that they are not receiving").  In any of these scenarios, Walker's copyright ownership claim (and consequently his infringement claim) is barred and he cannot "resuscitate [it] . . . by relying on claims against the defendants' [alleged] continuing course of" infringement even if those alleged acts occurred within the last three years.  *Simmons*, 810 F.3d at 116; *see also Kwan*, 634 F.3d at 230; *Tolliver v. McCants*, No. 05 Civ. 10840, 2009 WL 804114, at *10 (S.D.N.Y. Mar. 25, 2009).

## IV.   WALKER HAS NO LEGAL OWNERSHIP INTEREST IN THE COPYRIGHT IN THE LOGO AND THEREFORE CANNOT MAINTAIN A CLAIM FOR COPYRIGHT INFRINGEMENT

There is a second, independent reason why Walker's copyright claim fails.  There are only two ways in which someone who does not "author," or create, a work can claim copyright ownership:  if the work was created for that person by an employee within the scope of his or her employment (*i.e.*, the "work for hire" doctrine), or via a written assignment.  Walker admittedly is not an author of the logo; his alleged creators (Panchon, Mack, and Gonzalez) were not his employees; and there are no written assignments.  Accordingly, he does not own the logo, and

thus does not have the legal right to pursue a copyright infringement claim. *See* 17 U.S.C. §

201(a), (b), (d) (author, employer, or transferee, respectively, are presumptive owners of

copyright in a work); 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right

under a copyright is entitled . . . to institute an action for any infringement of that particular right

committed while he or she is the owner of it.").

### A.   Walker Does Not Own The Copyright In The Logo Because He Is Not The Author Of The Logo

The Court can easily dispense with the notion that Walker was the author of the logo

because Walker testified – and his witnesses confirm – that he did not actually "translate[] an

idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-*

*Violence v. Reid*, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102).

Walker did not draw the logo, but rather, Gonzalez, Mack, and Panchon allegedly did.[11]

(*See* Ex. 7 at 62:21-24 (Walker did not draw any of the components of what would become the

final logo); *id.* at 63:4-13 (Panchon drew the "R;" Mack drew the record; Gonzalez drew the

champagne bottle); *id.* at 63:19-64:5 (Gonzalez "retraced everything" with tracing paper "and

made one logo").)  Walker even admits that the idea for the logo – albeit not copyrightable in

and of itself – was not his, but rather came from Damon Dash.  (*Id.* at 49:18-22 (Dash told

Walker "I want an R, album and a champaign [sic] glass").)

Walker's admissions establish that he provided, at most, merely suggestions and general

instruction to Gonzalez, Mack, and Panchon about what the logo should look like and what

components it should contain.  (*See id.* at 61:13-62:20 (Walker gave the three artists direction,

---

[11] Defendants do not concede that Gonzalez, Mack, and Panchon actually created the logo with Walker because it is Defendants' position that Adrien Vargas created the logo.  Nonetheless, the Court can still grant Defendants summary judgment on the copyright claim because, even assuming Walker's story about the creation of the logo is true, the facts concerning Walker's own contributions to the logo are undisputed, and as a matter of law, Walker is not an author or owner of the copyright in the logo.

reviewed their work, and opined on how to combine the three design elements); *id.* at 63:11-24 (Walker "organize[d]" the components once they were drawn and "showed the[] [artists] how" to put the components together); *id.*at 68:10-23 (with respect to the champagne bottle, Walker only suggested that it should be "abstract" and gave Gonzalez the "idea" to add an upside down question mark and four bubbles); JSF ¶¶ 84-90.)  However, to qualify as an author, Walker must have "suppl[ied] more than mere direction or ideas."  *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994); *see also 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 256-59 (2d Cir. 2015) (director not entitled to copyright in "directorial contributions" to motion picture).  He did not; and his mere "collaboration . . . is not sufficient" to give rise to a copyright interest. *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998).

### B.    Walker Did Not Receive A Written Assignment Of The Copyright And The Logo Was Not Created As A Work Made For Hire

Under the Copyright Act, there are only two ways for a person who did not create a work to own its copyright:  by written assignment, or if the work was created as a "work made for hire."  *See* 17 U.S.C. §§ 201(a), (b), (d); 204(a).  The record demonstrates that Walker does not own the logo under either avenue.

There is no evidence in the record of a written transfer of the copyright in the logo. Indeed, Walker and his witnesses concede there was no written assignment of the logo to him by Gonzalez, Mack, or Panchon, as would be required by 17 U.S.C. § 204(a).  (Ex. 7 at 133:12-134:8 (Walker admits that none of Gonzalez, Mack, or Panchon ever signed a document "conveying any rights" in the logo or "transferring any rights" to the drawing); *id.* at 134:9-22 (Walker admits that there were no written documents regarding the logo other than the alleged contract with Dash); Ex. 9 at 111:6-15 (Panchon had no contracts or other agreements regarding

29

his role as a member of the team designing the logo); Ex. 13 at 32:17-25 (Mack has no

recollection of any agreement with Walker concerning the logo).)

Walker also does not own the logo as a work made for hire because he fails both

requirements for a "work made for hire" under § 101 of the Copyright Act.  First, Walker admits

that Gonzalez, Mack, and Panchon "didn't work for [him]" and therefore could not have made

contributions to the creation of the logo within the scope of their employment.  *See* 17 U.S.C. §

101.  (Ex. 7 at 132:22-133:11 (testifying that Gonzalez, Mack, and Panchon were at most

"independent contractors").)  Second, the logo does not fall within any of the categories of

"specially ordered or commissioned" works set forth in the Copyright Act as works that may be

deemed "for hire" pursuant to express written agreements.  17 U.S.C. § 101 (listing "a

contribution to a collective work, as a part of a motion picture or other audiovisual work," "a

translation," "a supplementary work," "a compilation," "an instructional text, [] a test, [] answer

material for a test," and "an atlas").  Even if it did, Walker and his witnesses testified that there

was no written agreement between or among them that would govern the terms of their

arrangement, which is also required by § 101 of the Copyright Act.  (*See* Ex. 7 at 134:9-22; Ex. 9

at 111:6-15, 112:15-17; Ex. 13 at 32:17-25.)

## V.     EVEN IF WALKER HAD AN OWNERSHIP INTEREST IN THE LOGO, HE GRANTED THE DEFENDANTS AN EXPRESS LICENSE TO USE IT

Walker's copyright infringement claim also fails because Walker contends that he

granted Defendants an express license to use the logo (which is a complete defense to copyright

infringement, *see U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir.1991)),

and ultimately intended to transfer ownership of the logo to Defendants.

Walker's testimony is antithetical to his own theory that his copyright in the logo has

been infringed since 1996.  (*See* SAC ¶¶ 66-68.)  Indeed, the centerpiece of Walker's case is the

supposed existence of a contract that *expressly permits* all of the Defendants to engage in the conduct Walker now claims is infringing.  (*See* Ex. 7 at 164:19-24 ("Q. . . . [T]he agreement that you reached with Damon Dash covered all of [the Defendants]?  A.  Correct.  Q.  So all the defendants had your permission to use the logo; correct?  A.  Correct.").)  Walker testified that Defendants were permitted to use the logo gratis for the first year after it was delivered (*i.e.*, 1996-1997), and for the next 10 years.  (*Id.* at 84:22-85:8, 121:6-24, 123:2-125:8.)

The same can be said for the time after the "royalty period" ended – from 2005, or 2006, or 2007 and into the future.  Walker admits he was not entitled to any payments for any time after the "royalty period" (*id.* at 122:20-25), and to impose post-royalty period damages would contravene the terms of the contract Walker claims he drafted.  Moreover, Walker testified that, after the royalty period ended, he was supposed to transfer his copyright in the logo to the Defendants.  (Ex. 12 (contract allegedly said "once payment is renderd [sic], I Dwayne D. Walker will transfer ownership of logo"); Ex. 7 at 80:11-12 (Walker said he told Dash "[o]nce you pay me I will transfer [the logo] over to you.").)  Assuming a lump-sum royalty payment was actually due sometime in 2005-2007, the failure to make that payment would be a breach of contract and not an infringement of copyright, and would not warrant an injunction that would prohibit Roc-A-Fella from using the logo and enjoying the attendant goodwill that it established in the brand over the course of 20 years.  Awarding Walker such relief is foreclosed based on Walker's claimed contract terms, which permitted the permanent use of the logo to represent the Roc-A-Fella brand.

Plaintiff, moreover, has proffered no evidence that would suggest that any of the Defendants other than RAF LLC engaged in any infringing act.  Plaintiff's contentions regarding copyright infringement in the Second Amended Complaint were made upon information and

belief (*see* SAC ¶¶ 71-76), and he has failed to identify any specific facts that would substantiate

them.  There can be no genuine dispute of fact when there are no facts in the record at all.

## VI.  WALKER'S COPYRIGHT CLAIMS ARE UNENFORCEABLE BECAUSE HIS COPYRIGHT REGISTRATION IS INVALID

Walker's infringement action is foreclosed because the uncontested evidence in the

record shows that, for two reasons, he does not have a valid copyright registration.  First, Walker

acknowledged that he submitted a re-creation of the logo, not a copy of the original design, with

his copyright application.  Second, he committed fraud on the Copyright Office by falsely

claiming he was the author of the copyrighted work.

### A.    Walker Did Not Submit An Original Deposit Copy

In order for Walker to pursue a copyright infringement action, he must have registered

the copyright in the logo pursuant to the requirements of the Copyright Act, including with

respect to his deposit copy.  *See* 17 U.S.C. § 411(a); *Coles v. Wonder,* 283 F.3d 798, 801 (6th

Cir. 2002).  A plaintiff cannot satisfy the deposit requirement by submitting a reconstruction of

the alleged copyrightable work.  *See Coles*, 283 F.3d at 802; *Seiler v. Lucasfilm, Ltd.,* 808 F.2d

1316, 1322 (9th Cir. 1986) ("The Copyright Act does not contemplate the copyrighting of a now

non-existent original on the basis of a tendered reconstruction."); *see also Kodadek v. MTV*

*Networks, Inc.*, 152 F.3d 1209, 1211-12 (9th Cir. 1998) (finding that plaintiff's reconstructed

drawings were not appropriate deposit copies and dismissing copyright infringement claim).

Walker submitted an Application for Copyright Registration to the United States

Copyright Office on April 21, 2010.  (Ex. 7 at 179:22-180:8; Ex. 32.)  However, the deposit copy

of the logo drawing he submitted with his application "was not the original drawing that [he]

gave to Mr. Dash in 1995."  (Ex. 7 at 196:20-197:3.)  Rather, the deposit copy was reconstructed

from a photograph taken of a logo that appeared on a Recording Industry Association of America

"gold plaque" for defendant Carter's *Dead Presidents* single.  (*See id.* at 181:9-22, 183:12-17.)

Walker testified that he e-mailed the photograph of the logo appearing on that plaque to a friend,

who, according to Walker, then "extracted" the logo design from the photograph and "touched it

up," including by adding a "black box" outline to the design. (*Id.* at 186:9-251, 218:12-219:4,

221:4-224:19, 227:7-22.)  Walker used a hard copy of this reconstruction as his deposit copy.

(*Id.* at 181:9-22, 186:14-21.)

    The deposit copy not only differs from the logo design that appears on the plaque, but it

also differs from the logo design that appears on the *Dead Presidents* commercial release – the

version of the logo design Walker claims as his own.  Specifically, as compared to the deposit

copy, the record shows that:  the "R" in the logo appearing on that release:  (a) includes a thin

outline where the "R" crosses the white circle inside the black record element; (b) features a

rounder end on its right side; (c) does not extend to the top edge of the black portion of the

record element; and (d) overlaps with the black record element on its left side.  (JSF ¶¶ 146-50;

*compare* Ex. 32 at WALKER-00014.033 (deposit copy) *with* Ex. 30 (sleeve for *Dead Presidents*

vinyl commercial release).)  Additionally, the record element on that release does not have a

white outlined border, while the record in the deposit copy does.  (JSF ¶ 151.)  Lastly, the entire

design in the deposit copy is contained within a black box field, while the design on that release

lacks this element.  (JSF ¶ 152.)

    Walker himself acknowledges that there are differences between the design appearing in

the deposit copy and the original logo design he allegedly submitted to Dash (which ultimately

appeared on the *Dead Presidents* commercial release).  (*See* Ex. 7 at 216:25-217:25.)  Because

"a copyright does not encompass designs that vary in essential respects from what was presented

to the Copyright Office," *Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514,

520 (S.D.N.Y. 2005), Walker's copyright claim fails.  *See Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 125 (2d Cir. 2014) (affirming grant of summary judgment dismissing plaintiff's copyright claims where plaintiff lacked valid copyright registration).

### B.     Walker Falsely Listed Himself As The Author Of The Logo

Finally, Walker defrauded the Copyright Office when he listed himself as the "author" of the logo design on the ground that it was a "work for hire."  As discussed at length above, that representation is patently false.  *See supra* Section IV.B; 17 U.S.C. § 408.  Walker's willful and deliberate misrepresentation constitutes fraud on the Copyright Office and serves as an independent basis for invalidating his copyright registration and defeating his copyright claim. *See Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 456 (2d Cir. 1989) (the "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action" (internal quotation marks omitted)).

When he filed his application, Walker failed to "advise the Copyright Office of facts which might have occasioned a rejection of the application."  *Id.* (internal quotation marks omitted).  As explained in Section IV, above, Walker is neither the author of the purportedly infringed logo design, nor is there any other basis on which he can assert copyright ownership of the logo.  Walker acknowledges as much, admitting that he did not participate in the creation of the logo, and conceding that there was neither a written assignment of the logo to him by Gonzalez, Mack, or Panchon, nor a work-for-hire arrangement.  *See supra* Section IV.B. However, in his copyright application for the logo, Walker falsely listed himself as the sole author and owner of the logo as an "employer for hire."  (*See* Ex. 32 at WALKER-00014.027.)

In issuing Walker's copyright registration, the Copyright Office presumably relied on Walker's false sworn statement that he was both the author and owner of the copyright in the logo.  Had Walker accurately stated that he was neither the author nor the owner of the copyright in the logo, or of any exclusive right in the logo, the Copyright Office ostensibly would not have issued his copyright registration.  *See* 17 U.S.C. § 408 ("[T]he owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim . . . ."); *see also Shady Records, Inc. v. Source Enters., Inc.*, No. 03 CIV.9944 (GEL), 2005 WL 14920, at *11 (S.D.N.Y. Jan. 3, 2005) ("[A] misrepresentation as to the ownership of the copyright would clearly affect the ability of the Copyright Office to properly register the copyright to a true owner."); *Sunham Home Fashions, LLC v. Pem-America, Inc.*, No. 02 Civ. 6284 (JFK), 2002 WL 31834477, at *4 (S.D.N.Y. Dec.17, 2003) (misrepresentation of copyrighted materials as "works for hire" material to validity of copyright registration).

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should grant Defendants' Motion for Summary Judgment.

Dated: New York, New York
   April 1, 2016

Respectfully submitted,

SHAPIRO ARATO LLP
By: /s/ Cynthia S. Arato
   Cynthia S. Arato
   Chetan A. Patil

500 Fifth Avenue, 40th Floor
New York, New York 10110
Telephone: (212) 257-4880
Fax: (212) 202-6417
carato@shapiroarato.com
cpatil@shapiroarato.com

*Attorneys for Defendants UMG Recordings, Inc.
(erroneously sued as Universal Music Group, Inc.), The
Island Def Jam Music Group, a division of UMG
Recordings, Inc., and Roc-A-Fella Records, LLC*

COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP

By: /s/ Eleanor M. Lackman
   Eleanor M. Lackman
   Scott J. Sholder

41 Madison Avenue, 34th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
ELackman@cdas.com
SSholder@cdas.com

*Attorneys for Defendant Shawn Carter ("Jay Z")*

DALE LIONEL SMITH, ESQ.

By: /s/ Dale Lionel Smith
   Dale Lionel Smith

483 Broadway, Suite 502
New York, New York 10013
Telephone: (212) 219-1000
Fax: (212) 219-1002
dsmith@law-smith.com
*Attorney for Defendant Damon "Dame" Dash*

36