UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DWAYNE D. WALKER, JR.,        :

                                 :

              Plaintiff,      :     No. 12-cv-5384 (ALC)(RLE)

                                 :

     vs.                    :     **DEFENDANTS' JOINT**

                                 :     **STATEMENT OF**

SHAWN CARTER ("JAY-Z"), DAMON  :     **UNDISPUTED**

"DAME" DASH, KAREEM "BIGGS" BURKE,  :     **MATERIAL FACTS IN**

UNIVERSAL MUSIC GROUP, INC., ISLAND  :     **SUPPORT OF**

DEF JAM MUSIC GROUP, ROC-A-FELLA  :     **DEFENDANTS' MOTIONS**

RECORDS, LLC,                   :     **FOR SUMMARY**

              Defendants.    :     **JUDGMENT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Pursuant to Local Civil Rule 56.1, Defendants Shawn Carter, Damon Dash, UMG

Recordings, Inc. (erroneously sued as Universal Music Group, Inc.) ("UMG"), Island Def Jam

Music Group (an unincorporated division of UMG Recordings, Inc.) ("Island Def Jam"), and

Roc-A-Fella Records, LLC ("RAF LLC") respectfully submit this statement of material facts for

which there is no genuine dispute:

## I.    BACKGROUND

###    A.    Plaintiff, The Individual Defendants And The Founding Of Roc-A-Fella Records

      1.     Defendants Dash, Carter, and Kareem Burke are the co-founders of the Roc-A-

Fella record label. (Plaintiff's Second Am. Compl. ("SAC") ¶ 13; Ex. 2 to the Declaration of

Cynthia S. Arato, dated April 1, 2016 ("Arato Decl.").)

      2.     Plaintiff Dwayne Walker is an individual who claims to have interacted with

Dash, Carter, and Burke around the time they formed their record label. (SAC ¶¶ 12, 15-18.)

3.     Dash, Carter, and Burke subsequently formed a corporation named Roc-A-Fella Records, Inc. ("Roc Inc.") to operate the Roc-A-Fella record label.  (SAC ¶ 49; Ex. 3 to Arato Decl.)

4.     Roc Inc. was incorporated on January 8, 1996, under the laws of the State of New York.  (Ex. 3 to Arato Decl.)

**B.     The Logo**

5.     This case concerns the logo that has been used to identify the Roc-A-Fella Records label since 1995 (the "Logo").  (Ex. 4 to Arato Decl.)

6.     The Logo is comprised of three elements:  a stylized R, a black vinyl record, and a stylized champagne bottle, as follows:



(Ex. 5 to Arato Decl. at 17:10-23; Ex. 6 to Arato Decl. at D000024.)

## II.    WALKER'S STORY REGARDING THE CREATION OF THE ROC-A-FELLA LOGO DESIGN

7.      Walker claims that he "became something of a consultant to Dash and Roc-A-Fella" in February or March 1995, by "assist[ing] Dash in purchasing sewing machines" and "brainstorm[ing]" ideas for a potential Roc-A-Fella clothing line.  (SAC ¶¶ 15-16; Ex. 7 to Arato Decl. at 21:23-23:9, 26:11-24, 30:4-21.)

8.      Walker testified that in or around October or November of 1995, he was "sitting on the couch" at Dash's apartment when he happened to "look down [and] see a piece of paper" that contained a design for a logo for Roc-A-Fella Records.  (Ex. 7 to Arato Decl. at 45:25-46:25.)

9.      At the time, Walker worked at an AT&T store and as a salesperson for a fashion line.  (Ex. 7 to Arato Decl. at 22:13-23, 25:11-15, 51:20-25.)

10.     Walker was not a graphic designer, and "wasn't a great illustrator."  (Ex. 8 to Arato Decl. at 113:24-114:8, 133:22-134:7, 379:4-8.)

11.     Walker testified that the logo he saw contained the Roc-A-Fella name in a font similar to the Everlast sports brand with a graphic of people on top.  (Ex. 7 to Arato Decl. at 47:2-8.)

12.     Walker testified that upon seeing that logo, he told Dash that he could "do something better than that definitely." (Ex. 7 to Arato Decl. at 46:21-25.)

13.     Walker testified that in response to his statement, Dash told Walker that he wanted a logo that contained "an R, album and a champaign [sic] glass."  (Ex. 7 to Arato Decl. at 49:18-22.)

14.     Walker testified that "[a]t that point straight off the couch," Dash and Walker reached an oral agreement, and "shook on it," for Walker to draw the new logo for Roc-A-Fella

in exchange for Walker being paid "5 percent of everything that the logo is on and [$]3500." (Ex. 7 to Arato Decl. at 50:2-18.)

15.     Walker testified that he gathered three men to draw the elements that Dash had told him to draw – Flavius Panchon, Freddie Mack, and Kenny Gonzalez.  (Ex. 7 to Arato Decl. at 61:4-18.)

16.     Walker testified that he chose Mack to draw the record because "[his] circles come out circular."  (Ex. 7 to Arato Decl. at 61:4-16, 69:8-10.)

17.     All Mack allegedly did was trace the circle using a saucer or a disk.  (Ex. 7 to Arato Decl. at 63:6-9 (testifying that Panchon gave Mack "something to trace the album out"); *see also* Ex. 9 to Arato Decl. at 57:14-25 (Panchon gave Mack "a saucer or disk or cover for something that was a nice cylinder that could make the album").)

18.     Walker testified that he selected Panchon to draw the R even though "Flavi is a little too stiff, [and] his drawing didn't have no feel to it," and Panchon could not recreate the R at his deposition.  (Ex. 7 to Arato Decl. at 61:15-16, 69:5-8; Ex. 9 to Arato Decl. at 59:15-60:13; Ex. 10 to Arato Decl.; *see also* Ex. 11 to Arato Decl. (Panchon's recreation of a purported initial logo drawing that Dash rejected).)

19.     Gonzalez "came out of the blue" to allegedly draw the champagne bottle.  (Ex. 9 to Arato Decl. at 112:22-113:5.)

20.     Walker admitted that he was not sure what Gonzalez's occupation was, but described Gonzalez as a "graphic person."  (Ex. 7 to Arato Decl. at 58:19-21, 127:6-10.)

21.     Walker testified that all of the men got together one evening at Panchon's house, and Mack, Panchon and Gonzalez each drew his part on a separate piece of paper.  (Ex. 7 to Arato Decl. at 61:13-18-63:16-18.)

22.     Walker testified that Mack, Panchon, and Gonzalez each left that night with his own separate drawing.  (Ex. 7 to Arato Decl. at 65:12-66:6.)

23.     Walker admits that he did not draw the logo drawing or any element of it.  (Ex. 7 to Arato Decl. at 62:21-24.)

24.     Walker testified that the next day, he, Mack, Panchon, and Gonzalez went to a Kinko's, where Gonzalez "traced the three drawings onto one piece of paper.  (Ex. 7 to Arato Decl. at 63:19-64:5 ("Kenny took it and he retraced everything and made one logo."); *see also* 64:6-22, 67:3-18; Ex. 9 to Arato Decl. at 58:12-18 ("Kenny took my R, his bottle that he did and Freddie's album and he put it all together and traced it out on tracing paper and proportioned everything to fit the way it needed to.").)

25.     Walker testified that he, Panchon, Mack, and Gonzalez left Kinko's and met with Dash, where they presented him with their drawing.  (Ex. 7 to Arato Decl. at 70:12-71:25.)

26.     Walker testified that at that meeting, Dash indicated that he was no longer willing to pay a 5% royalty in exchange for the logo drawing, as they had allegedly originally agreed on.  (Ex. 7 to Arato Decl. at 72:23-73:8.)

27.     Walker testified that he told Dash "You have to do that.  That is my copyright.  My intellectual property right.  Nobody would have been able to put that thought out if I didn't do that."  (Ex. 7 to Arato Decl. at 76:23-77:5.)

**28.**     Walker testified that he left the meeting without an agreement regarding the logo drawing.  (Ex. 7 to Arato Decl. at 73:9-13.)

## III.     THE ALLEGED WRITTEN CONTRACT

29.     Walker testified that, in or around December 1995, a few days after presenting Dash with the drawing, he met with Dash and they renegotiated their deal as follows:  (a) Dash

would pay $3,500 upfront; (b) if "[y]ou use it after the first year of usage you give me 2 percent for the next 10 years; and (c) "[o]nce you pay me I will transfer [the logo] over to you."  (Ex. 7 to Arato Decl. at 76:12-77:15, 78:11-25, 80:9-16, 287:15-17.)

30.     Walker testified that he met with Dash "a couple of days" later at a recording studio.  (Ex. 7 to Arato Decl. at 83:19-24.)

31.     Walker testified that at that meeting, Dash paid him $3,500 "in singles" from "a box or shoe box," which Walker then put "in [his] pocket."  (Ex. 7 to Arato Decl. at 83:19-84:16.)

32.     Walker testified that he wrote down the terms of his agreement with Dash at that same meeting on a "white piece of paper like you would use . . . from . . . a copy machine."  (Ex. 7 to Arato Decl. at 84:22-85:8, 114:25-115:13.)

33.     Walker testified that he and Dash signed the document at this meeting at the recording studio.  (Ex. 7 to Arato Decl. at 84:22-85:8, 87:2-12.)

34.     Walker testified that the written agreement appeared as follows:

On this DAY OF _____
I herby Dwayne D. Walker
agree to accept 3,500 and 2% percent
For Creating RocaFella Logo.
In which is payable
For 10 yrs after 1st year use
once payment is renderd, I Dwayne D. Walker
will transfer ownership of Logo Dame Dash
IN Execution of RocaFella Records
_____

Dame Dash (Chief Excutive Officer)
Kaream Biggs Burke
                                        _____
                                        Dwayne Walker
S. Carter (JAY-Z)

(Ex. 7 to Arato Decl. at 84:22-85:8, 86:14-21; Ex. 12 to Arato Decl. (all errors in original).)

35.     Walker admits that Carter and Burke did not sign the alleged contract.  (Ex. 7 to Arato Decl. at 87:2-12.)

36.     Walker testified that after Dash signed this alleged document, he gave Dash his only copy of the drawing and left with the "only copy of the [alleged] contract."  (Ex. 7 to Arato Decl. at 89:22-90:17.)

37.     Walker testified that the royalties provided for in the alleged contract would accrue during a 10-year period commencing after the first year of the logo's use, but the 2% royalty payment was only payable in a single lump sum payment at the end of that 11-year period.  (Ex. 7 to Arato Decl. at 121:6-24, 123:2-125:8; *see also id.* 126:12-21 (testifying that he "was under the assumption that [his] royalty wouldn't be until 2007"), 137:8-10.)

38.     Walker testified that "[i]t wasn't specified between [him] and Dash exactly when a check had to go out the door."  (Ex. 7 to Arato Decl. at 126:7-11.)

39.     Walker testified that under the terms of the alleged contract, he would not be entitled to any money after the royalty period ended.  (Ex. 7 to Arato Decl. at 122:20-25.)

40.     Walker testified that he believed he "still ha[d] to get [the contract] in legal terms" on a "lawyer's legal paper," but that he "didn't make any effort" to do so.  (Ex. 7 to Arato Decl. at 207:13-20, 212:8-17.)

**IV.    WALKER HAS NO DOCUMENTS OR THIRD PARTY WITNESS WITH PERSONAL KNOWLEDGE OF THE SIGNING OF THE ALLEGED WRITTEN CONTRACT WHO CAN CORROBORATE ITS SUPPOSED EXISTENCE OR ITS TERMS**

41.     Walker has not produced the alleged contract, and testified that he lost the only copy of it no later than 1998.  (Ex. 7 to Arato Decl. at 102:4-6.)

42.     Walker testified that he left the alleged contract in a desk drawer at his uncle's apartment at 720 Lenox Avenue, when he moved to Atlanta, along with his baseball cards and

7

other memorabilia. (Ex. 7 to Arato Decl. at 90:22-91:4, 91:20-23, 92:11-17, 92:23-93:2, 101:18-102:3.)

43. Walker admits that there are no written documents, other than his alleged lost agreement, evidencing his purported contract. (Ex. 7 to Arato Decl. at 134:9-22.)

44. None of Walker's witnesses, including Mack, Panchon, and Sierra, were present for the alleged signing of the contract. (Ex. 7 to Arato Decl. at 83:25-84:2, 201:14-23; Ex. 9 to Arato Decl. at 81:13-82:3; Ex. 8 to Arato Decl. at 208:14-16; *see also* Ex. 13 to Arato Decl. at 31:12-17.)

45. Walker testified that when he met with Dash at the recording studio it was "just [him]." (Ex. 7 to Arato Decl. at 83:25-84:2.)

46. Walker testified that he showed the alleged contract to Gonzalez, Panchon, and Mack only after it was signed. (Ex. 7 to Arato Decl. at 202:3-203:8, 204:20-25.)

47. Mack does not recall ever "seeing a document concerning Mr. Walker being paid for the logo design." (Ex. 13 to Arato Decl. at 31:12-17.)

48. Panchon testified that he saw a document, but that the "only reason that [he] know[s] it was a contract is because Mr. Walker said that it was." (Ex. 9 to Arato Decl. at 81:24-82:3.)

49. Panchon admitted that he "didn't focus on the contract;" he did not "s[i]t there and [go] into details;" and he only knows that "it was a paragraph of some things and I can't say it was this, this and this" because "[a]ll of that is blank." (Ex. 9 to Arato Decl. at 79:20-80:3.)

50. Walker does not have contact information for Gonzalez, and said that he has not spoken with Gonzalez since December 1995. (Ex. 7 to Arato Decl. at 286:14-17, 287:2-14; Ex. 14 to Arato Decl. at 406:3-8.)

51.     Walker testified that he did not show the document to anyone other than Gonzalez, Mack, and Panchon.  (Ex. 7 to Arato Decl. at 215:20-23.)

52.     Walker testified that David Sierra had no personal knowledge regarding this case except for alleged conversations between Walker and Dash regarding Dash's "vision for the clothing line."  (Ex. 7 to Arato Decl. at 258:10-259:13.)

53.     At his deposition, David Sierra initially testified that he never saw a signed version of the alleged written contract between Dash and Walker.  (Ex. 8 to Arato Decl. at 183:18-25.)

54.     During the lunch break at his deposition, Sierra spoke to Walker's lawyer (who also represents Sierra) about his testimony.  (Ex. 8 to Arato Decl. at 186:20-187:2.)

55.     Sierra signed an unnotarized affidavit in this case, which was filed on August 5, 2014 and which was drafted by Walker's counsel.  (Dkt. No. 114-1; Ex. 8 to Arato Decl. at 322:20-23.)

56.     Sierra stated on the record that "Mr. Berry had mentioned to me I said I didn't see the contract.  I actually did see the contract.  I don't know exactly what time and date of it, but I remember Damon Dash's specific signature . . . . [Mr. Berry] just spoke to me about my affidavit again.  Which I had mentioned in it."  (Ex. 8 to Arato Decl. at 186:12-187:2.)

57.     Sierra also then stated that Walker had shown him the alleged signed contract between Dash and Walker once and that he had read it.  (Ex. 8 to Arato Decl. at 196: 17-197:14, 198:11-16.)

58.     Sierra could not "remember the specific instance" when he saw the alleged contract.  (Ex. 8 to Arato Decl. at 190:22-191:14; *see also id*. at 194:3-8, 195:9-13.)

59.     Sierra testified that the document he saw provided for an upfront payment of $35,000.  (Ex. 8 to Arato Decl. at 174:5-15, 177:12-20 (testifying that the contract specified a payment of $35,000 and a royalty of 2%).)

60.     Sierra testified that he "knew there was one [date]" on the contract regarding the end of the royalty period, that he "read [2007] on the contract," and that he saw "for sure" the "year 2007 . . . on the contract."  (Ex. 8 to Arato Decl. at 420:18-24, 427:9-11, 439:9-11; *see also id* at 198:17-22 (testifying that the contract "had mentioned about our 2 percent over 10 years and I think the end of the day was 2007 that it was, or 2007 that it was going to be over, it was like a 10 year span or 12 year span of time").)

61.     Sierra testified that he saw only Dash's signature on the document and not Walker's.  (Ex. 8 to Arato Decl. at 199:4-200:3 (asking "Why would Mr. Walker need to sign [the contract]?" and stating that he did not recall seeing Walker's signature on the contract).)

62.     Sierra testified that "there [were] lines on the paper" of the purported contract that he saw.  (Ex. 8 to Arato Decl. at 200:24-25.)

63.     Sierra testified that Walker showed him the alleged written contract as late as 2000.  (Ex. 8 to Arato Decl. at 178:14-179:2.)

64.     Sierra testified that Walker carried the contract around "in a white looseleaf binder" for "five to 10 years" after the contract's alleged execution.  (Ex. 8 to Arato Decl. at 95:17-96:17.)

65.     Sierra testified that he recognized Damon Dash's signature on the document because he allegedly saw Dash's signature just one other time on a lease that Roc-A-Fella signed for office space, which Dash had shown unidentified people "either at his home or at [Roc-A-Fella's office]."  (Ex. 8 to Arato Decl. at 203:21-204:23.)

66.     Sierra testified that Walker showed him an unsigned draft of the alleged contract before the meeting between Walker and Dash at which the contract was allegedly drafted and signed.  (Ex. 8 to Arato Decl. at 172:24-178:9; *contra* Ex. 7 to Arato Decl. at  84:22-85:8 (Walker testified that he "wrote down" the alleged contract "before [he] left the studio" meeting with Dash).)

67.     We can change this to Defendants do not admit that the contract existed, and in fact they deny that allegation.  (*E.g.*, Ex. 15 to Arato Decl. at ¶ 25; Ex. 16 to Arato Decl. at ¶ 25; Ex. 17 to Arato Decl. at ¶ 25.)

## V.     WALKER'S SELF-CONTRADICTORY TESTIMONY ABOUT HIS PURPORTED ROYALTY PAYMENT

68.     On May 25, 2010, Walker's attorney at the time, Lawrence Goodwin of the law firm Kasowitz Benson Torres & Friedman LLP, sent a letter to Michael Ostroff, General Counsel of Universal Music Group, Dash, and Carter (the "May 25 Letter").  (Ex. 19 to Arato Decl.; Ex. 38 to Arato Decl., No. 5.)

69.     The May 25 Letter requested "at least $7 million" in royalties under the purported contract.  (*Id.*)

70.     The May 25 Letter states that "in 1995, Mr. Walker . . . designed the Roc-A-Fella logo . . . pursuant to a contract between Mr. Walker and Roc-A-Fella.  The contract, signed by Mr. Walker, and by Mr. Dash on behalf of Roc-A-Fella, provided for an initial payment of $3,500, upon submission of the artwork to Roc-A-Fella, and a royalty equal to two-percent of sales of all products and services using the logo, *payable 10 years after the execution of the contract*."  (*Id.* (emphasis added).)

71.     On July 2, 2010, Goodwin sent a letter to Michal Seltzer, Vice President of Business & Legal Affairs at Universal Music Group, enclosing the May 25 Letter.  (Ex. 20 to Arato Decl.)

72.     On August 3, 2010, Goodwin sent a letter to Seltzer and others, in which he stated "[t]he terms of the agreement are set forth in my original correspondence dated May 25, 2010 to Mr. Ostroff and others."  (Ex. 21 to Arato Decl.)

73.     Walker admitted that "all the information" contained in the May 25 Letter was based on information Walker told Goodwin.  (Ex. 7 to Arato Decl. at 150:14-21.)

74.     Walker reviewed the May 25 Letter before it was sent and at that time, he believed "everything" in the letter was "accurate."  (Ex. 7 to Arato Decl. at 148:24-149:8.)

75.     When asked by his own lawyer on direct examination at his deposition if the May 25 Letter presented "an accurate description of the contract," Walker answered "Yes."  (Ex. 7 to Arato Decl. at 289:7-18 ("Q. The third line it says 'The contract signed by Mr. Walker.'  A. 'The contract signed by Mr. Walker and Mr. Dash on the behalf of Rock-A-Fella [sic] Records provided for initial payment of $3500 upon submission of artwork to Roc-A-Fella and the royalty equal to 2 percent of sale of all products and services using the logo payable 10 years after the execution of the contract.'  Q.  Is that an accurate description of the contract?  A. Yes").)

76.     In 2010, Walker sent several emails to Jennifer Justice, an attorney at Shawn Carter Enterprises, from his email account, dezeclassics123@yahoo.com.  (Ex. 7 to Arato Decl. at 161:10-14, 274:24-275:4, 275:25-276:4.)

77.     Walker conceded that he "did not convey any inaccurate information" in these emails, that he cannot recall anything inaccurate in any of the emails sent to Justice, and that at

the time he sent them, he understood that the information was "true and accurate."  (Ex. 7 to Arato Decl. at 162:2-16.)

78.     In an email to Justice dated August 6, 2010, Walker stated that the alleged contract provided for "2pct Of everything my intellectual property was on *after its tenth year of use*."  (Ex. 22 to Arato Decl. at (emphasis added).)

79.     In response to his own lawyer's questioning, Walker testified that the representations in his August 6, 2010 email to Justice were "correct, after the 10th year of use." (Ex. 7 to Arato Decl. at 292:6-293:3.)

80.     In an email to Justice dated September 18, 2010, Walker stated that he agreed to "3500 cash upfront negoitea [sic] down from 5 percent too [sic] 2 percent *after ten years of use*. . . . 2 percent DUE!  *1995 payable 2005*."  (Ex. 23 to Arato Decl. (emphases added))

**81.**     In an email to Justice dated September 18, 2010, Walker stated "2percent after ten years!"  (Ex. 24 to Arato Decl.)

## VI.   WALKER DOES NOT OWN THE COPYRIGHT TO THE ALLEGED LOGO DRAWING AND IS INCAPABLE OF TRANSFERRING THAT LOGO DRAWING TO DEFENDANTS

82.     Other than the three elements requested by Dash, Walker claims that "[t]he whole concept for" the logo drawing was his, and that he "directed the whole thing."  (Ex. 7 to Arato Decl. at 62:24-63:3; *see also* Ex. 9 to Arato Decl. at 115:7-21 (testifying that Walker "was directing the shapes and the movement of everything we did.").)

83.     However, Walker admits that he did not draw the logo drawing or any element of it.  (Ex. 7 to Arato Decl. at 62:21-25.)

84.     Walker testified that he gave Gonzalez, Mack, and Panchon "a certain amount of time" and said that "we are going to use the free style," and when he told everyone to stop,

"Flavi's R was right on point.  Mack, the album was right on point and Kenny the champaign [sic] bottle was right on point."  (Ex. 7 to Arato Decl. at 62:2-13; *see also* Ex. 9 to Arato Decl. at 56:11-57:13 (Walker "allocated different tasks".)

85.     Walker testified that he told Gonzalez "this is how we are going to do the champaign [sic] bottle.  Abstract.  So I need it to look like a bottle but not look like a bottle.  It can't look so stiff.  It has to have some type of flow to it."  (Ex. 7 to Arato Decl. at 61:13-21; *see also* Ex. 7 to Arato Decl. at 68:10-23 (Walker testified he told Gonzalez to make the champagne bottle "abstract so it doesn't look like a generic bottle" and that it had to "have some type of feeling to it"); Ex. 9 to Arato Decl. at 63:15-64:17 (Walker told them "it has to be fluid, abstract. It has to have movement").)

86.     Walker testified that he "looked at" the drawings prepared by Mack, Panchon, and Gonzalez.  (Ex. 7 to Arato Decl. at 62:11; *see also* Ex. 9 to Arato Decl. at 63:22-25 ("We just kept sketching things and showing him and we kept sketching.  When he saw two elements that he liked, that's it.  Take that, take that, take that and put them together.").)

87.     Walker testified that he gave Gonzalez the "idea" to add an "upside down" "question mark inside the bottle," and "four bubbles coming out of the bottle to represent who Jay is, where Jay came from.  You know, what doe[s] []he do." (Ex. 7 to Arato Decl. at 20:2-11, 67:21-24, 68:19-23, 69:18-24.)

88.     Walker testified that he came up with the "idea" for "[t]he whole position of the logo" after Mack, Panchon, and Gonzalez had drawn the component parts.  (Ex. 7 to Arato Decl. at 68:6-9.)

89.     Walker testified that he told Mack, Panchon, and Gonzalez that "what we need to do is combine them. . . . The album goes behind this, put the R right here and drop the

champaign [sic] bottle a little bit off the album but keep it centered so it kind of, the top kind of looks like the middle of a album [sic] and that is what we did."  (Ex. 7 to Arato Decl. at 62:14-20; *see also id.* 63:11-24 (Walker "organized" the components and "showed [Mack, Panchon, and Gonzalez] how" to "put it together"); Ex. 13 to Arato Decl. at 24:22-25:3 (Walker wanted "the R and champagne bottle to somehow fit together"); Ex. 9 to Arato Decl. at 58:2-11 (Walker "was like, put it here, move it here, he was directing the whole thing").)

90.     Walker testified that, when the final logo drawing was completed at the Kinko's store, Gonzalez positioned the component parts, traced them onto tracing paper, and "ink[ed] it up."  (Ex. 7 to Arato Decl. at 64:4-15, 67:3-18; *see also* Ex. 9 to Arato Decl. at 58:12-18 ("Kenny took my R, his bottle that he did and Freddie's album and he put it all together and traced it out on tracing paper and proportioned everything to fit the way it needed to.").)

91.     Walker never reached any agreement with Gonzalez, Panchon, or Mack regarding their compensation for designing the logo.  (Ex. 7 to Arato Decl. at 203:15-204:3; Ex. 13 to Arato Decl. at 32:13-25; Ex. 9 to Arato Decl. at 111:16-24, 112:12-14.)

92.     Walker never signed any agreement with Gonzalez, Panchon, or Mack "conveying any rights" or "transferring any rights" they had in the logo drawing.  (Ex. 7 to Arato Decl. at 133:12-134:8; Ex. 9 to Arato Decl. at 111:6-112:11 (testifying that he had no "agreements . . . about [his] relationship as a team member"); Ex. 13 to Arato Decl. at 22:2-16, 32:17-25 (testifying that he did not recall "ever hav[ing] any agreement with Mr. Walker concerning the Roc-a-Fella logo design").)

93.     Walker never reached any agreement with Gonzalez, Panchon, or Mack regarding how their work would be treated.  (Ex. 13 to Arato Decl. at 22:2-6 (testifying that he did not "recall any discussion with [Walker] about how the two of you would treat any work that you did

in connection with creating that logo"); Ex. 9 to Arato Decl. at 112:15-17 (testifying that "there was no specific arrangement about how [his] work would be treated.").)

94.     Walker admitted that Gonzalez, Panchon, and Mack "didn't work for [him]" as employees and that they were only "independent contractors."  (Ex. 7 to Arato Decl. at 132:22-133:11.)

## VII.    WALKER'S COPYRIGHT CLAIM IS AN OWNERSHIP CLAIM THAT IS TIME-BARRED

95.     Defendants dispute Walker's claim that he (or his group of friends and acquaintances) drew the Logo.  Defendants contend that Adrien Vargas drew the Logo.

96.     Vargas was hired in 1995 as the Art Director for Roc-A-Fella.  (Ex. 5 to Arato Decl. at 14:3-10.)

97.     Vargas testified that, as art director, he was responsible for setting up the record label's art department.  (Ex. 5 to Arato Decl. at 14:14-24; Ex. 25 to Arato Decl. at 21:19-25.)

98.     Vargas graduated with a Bachelor of Fine Arts from the School of Visual Art in Manhattan, with a major in illustration and a minor in graphic design.  (Ex. 5 to Arato Decl. at. at 10:20-25.)

99.     Prior to working at Roc-A-Fella, Vargas did illustrations for The Source Magazine and freelance work "for various groups in the music industry."  (Ex. 5 to Arato Decl. at 11:5-23.)

100.    Vargas testified that as Art Director, he was responsible for creating Roc-A-Fella's "branding," which included the "[c]reation of logos, promotional materials, [and] anything client facing."  (Ex. 5 to Arato Decl. at 14:14-24.)

101.    Vargas testified that prior to designing the logo, he and Dash listened to music that Roc-A-Fella was recording at the time, to "get inspired and kind of hear what they were doing."  (Ex. 5 to Arato Decl. at 17:24-18:10, 19:1-3.)

102.    Vargas testified that he decided to use the champagne bottle as an element of the logo because "[t]here was mention of champagne bottles in songs and [Dash] had a champagne bottle in his office," and Dash wanted "a high-class look."  (Ex. 5 to Arato Decl. at 17:24-18:19.)

103.    Vargas testified that he put "a little symbol" inside the bottle that "looks like the letter J" as "a nod to" Carter.  (Ex. 5 to Arato Decl. at 17:18-23, 45:19-25.)

104.    Vargas testified that he decided to use "a single R" and the record to "symbolize" the Roc-A-Fella Records name.  (Ex. 5 to Arato Decl. at 19:13-20:1.)

105.    Vargas testified that he drew sketches reflecting his "thoughts, doodles, [and] ideas" for the design of the Roc-A-Fella logo in sketchbooks that he created and maintained in the ordinary course of his business at Roc-A-Fella.  (Ex. 5 to Arato Decl. at 46:20-48:12.)

106.    Vargas retained these sketchbooks and other mementos of his work, and the sketchbooks are produced as Exhibits 6 and 8 at his deposition taken June 18, 2014.  (Ex. 5 to Arato Decl. at 21:2-21, 48:5-21; *see also, e.g.*, *id.* at 57:23-62:21 & Ex. 26 to Arato Decl. at (containing "exploration[s]" of the letter R); Ex. 5 to Arato Decl. at 65:7-17 & Ex. 27 to Arato Decl. at AV000166, AV000168 (discussing potential fonts for CD label); Ex. 5 to Arato Decl. at 66:17-68:18 & Ex. 27 to Arato Decl. at AV000169 (containing drawings of "an abstract bottle"); Ex. 5 to Arato Decl. at 70:13-25 & Ex. 27 to Arato Decl. at AV000177 (containing a drawing of "bubbles which are the same kind of shape and style as the bubbles that are in the bottle").)

107.    Vargas testified that he created three versions of the Roc-A-Fella logo.  (Ex. 2 to Arato Decl. at 20:2-21:1.)

108.   Vargas testified that he drew the first iteration of the logo design for a business card for Dash.  (Ex. 5 to Arato Decl. at 35:18-36:25; Ex. 28 to Arato Decl. at AV000004.)

109.   The same logo design appears on a white label release for the *Dead Presidents* single.  (Ex. 5 to Arato Decl. at 38:23-39:5; Ex. 29 to Arato Decl.)  A "white label" is a promotional release of a single that is provided to certain radio stations and DJs in order to generate buzz for the recording prior to the commercial release of the recording and the full length album on which it is to appear.  (Ex. 2 to Arato Decl. at 37:20-38:5; Ex. 5 to Arato Decl. at 37:8-38:15.)  *Dead Presidents* was a recording appearing on Defendant Carter's album *Reasonable Doubt*.  (Ex. 5 to Arato Decl. at 38:16-22.)

110.   Vargas testified that he created the second iteration of the logo design, which appears on the *Dead Presidents* commercial release.  (Ex. 5 to Arato Decl. at 39:16-40:13, 41:2-16; Ex. 30 to Arato Decl. at D000617.)

111.   Vargas testified that he redesigned the logo for the *Dead Presidents* commercial release from the logo design appearing on the *Dead Presidents* white label because "a thin pen drawing" would not "suit the needs of sitting on a shelf or being recognizable."  (Ex. 5 to Arato Decl. at 40:14-41:1.)

112.   The *Dead Presidents* commercial release credited Vargas with "Design" under the pseudonym "Heavy Exhaust."  (Ex. 5 to Arato Decl. at 42:5-22; Ex. 30 to Arato Decl. at D000617.)

113.   Vargas testified that he created the third and final iteration of the logo design, which appears on the *Reasonable Doubt* album.  (Ex. 5 to Arato Decl. at 43:1-44:12; Ex. 31 to Arato Decl.)

114.     The *Reasonable Doubt* album release credited Adrien Vargas with "Art Direction."  (Ex. 5 to Arato Decl. at 44:23-45:8; Ex. 31 to Arato Decl.)

115.     Walker testified that his group drew only one version of the logo drawing: the version that appeared on the *Dead Presidents* commercial release in March 1996.  (Ex. 7 to Arato Decl. at 165:22-166:6, 169:2-8.)

116.     Walker does not claim that he or his group created the more rudimentary version of the design that appeared on the earlier white label release for *Dead Presidents* or Dash's business card.  (Ex. 7 to Arato Decl. at 166:4-10, 174:14-21, 362:2-22.)

117.     Walker testified that he believes that someone must have taken the logo design from the *Dead Presidents* commercial release and "redid it for the *Dead Presidents* white label release" and Dash's business card, and then "redid it again for" the *Reasonable Doubt* commercial release.  (Ex. 7 to Arato Decl. at 173:8-177:15, 363:10-14, 427:15-428:2.)

118.     Walker testified that when *Reasonable Doubt* was released in 1996, he noticed that the logo design appearing on the release had been altered from "his" purported logo design appearing on the *Dead Presidents* commercial release.  He testified that he also noticed that the *Reasonable Doubt* release credited Vargas with "artwork and design."  (Ex. 7 to Arato Decl. at 166:7-167:10; 387:10-389:7.)

119.     Walker testified that he was "furious" because the design of "the R had changed," and that he knew because of the change to the design and because of the credit to Vargas that Roc-A-Fella "was going to deny that [he] had a right to this design."  (Ex. 7 to Arato Decl. at 388:24-389:17.)

120.     Walker testified that, after he noticed the changes to the logo design on *Reasonable Doubt*, he called Roc-A-Fella's office on two occasions and spoke with Vargas and Dash.  (Ex. 7 to Arato Decl. at 167:4-168:16, 170:3-172:21, 389:18-21.)

121.     Walker testified that he "was basically like, yo, Adri[e]n, how could you say you did the logo.  I did the logo."  (Ex. 7 to Arato Decl. at 171:13-19.)

122.     Walker testified that he told Dash "you put artwork done by Adrien Varg[a]s. People look at that they are going to assume that he did the logo.  Give me my credit."  (Ex. 7 to Arato Decl. at 167:23-168:2; *see also id*. at 172:10-21.)

123.     Walker concedes that he was never paid any royalties by any Defendant, which he has contended were due no later than 2007.  (Ex. 7 to Arato Decl. at 126:12-21.)

124.     Walker did not file this lawsuit until 2012.  (List of Docket Entries.)

125.     Roc Inc. filed for a registration for the trademark in the Roc-A-Fella logo on December 3, 1996 claiming exclusive nationwide rights to the logo.  (Ex. 4 to Arato Decl. at; Ex. 6 to Arato Decl.)

126.     The trademark application represented that Roc. Inc. was "the owner of the service mark sought to be registered," and that "no other person, firm, corporation, or association has the right to use the above identified mark."  (Ex. 4 to Arato Decl. at D000007.)

## VIII.   WALKER'S COPYRIGHT CLAIM IS BARRED BY HIS CONTRACT CLAIM

127.     Walker testified that, under his contract, he allowed all of the Defendants to use the logo drawing that he now contends is infringing.  (Ex. 7 to Arato Decl. at 164:19-24 ("Q. . . . [T]he agreement that you reached with Damon Dash covered all of [the Defendants]?  A. Correct.  Q.  So all the defendants had your permission to use the logo; correct?  A.  Correct.").)

128.     Walker has not purported to terminate the contract.

129.     According to Walker, the alleged contract provided that he would "transfer ownership of [the] Logo" upon payment of his alleged royalty.  (Ex. 12 to Arato Decl.)

## IX.     WALKER DID NOT SUBMIT A VALID DEPOSIT COPY WITH HIS COPYRIGHT APPLICATION AND OTHERWISE SUBMITTED A FALSE APPLICATION

130.     On April 21, 2010, Walker submitted an Application for Copyright Registration ("Copyright Application") with the United States Copyright Office.  (Ex. 32 to Arato Decl.; Ex. 7 to Arato Decl. at 179:22-180:8.)

131.     The Copyright Application was prepared by Lawrence Goodwin.  (Ex. 7 to Arato Decl. at 180:9-13.)

132.     Goodwin represented Walker from at least March 26, 2010 through August 4, 2010.  (Ex. 7 to Arato Decl. at 137:13-21, 148:11-14; Ex. 38 to Arato Decl., No. 5.)

133.     Walker reviewed the Copyright Application before it was submitted to the Copyright Office and signed it under penalty of perjury.  (Ex. 7 to Arato Decl. at 180:14-181:5; Ex. 32 to Arato Decl. at WALKER-00014.031.)

134.     Walker submitted a deposit copy of the logo drawing along with his Copyright Application (the "Deposit Copy").  (Ex. 32 to Arato Decl. at WALKER-00014.033; Ex. 7 to Arato Decl. at 181:6-8.)

135.     Walker admitted that the Deposit Copy "was not the original drawing that [he] gave to Mr. Dash in 1995."  (Ex. 7 to Arato Decl. at 196:20-197:3.)

136.     Walker testified that the Deposit Copy was created from a photograph taken of the logo design that appeared on a Recording Industry Association of America ("RIAA") "gold plaque" for the *Dead Presidents* single.  (Ex. 7 to Arato Decl. at 181:9-22, 183:12-17.)

137.    Walker testified that in 2001 or 2002, he worked at a record store called the "Music Vault" which had an RIAA gold plaque for *Dead Presidents* in its possession.  (Ex. 7 to Arato Decl. at 181:23-182:11, 183:20-184:3.)

138.    Walker testified that in or around this time, he took a picture on his phone of the logo design appearing on the RIAA gold plaque, but he subsequently lost the phone.  (Ex. 7 to Arato Decl. at 184:23-185:16, 313:20-24.)

139.    Walker testified that in or around 2010, he ran into one former coworker from the Music Vault either at a restaurant or at a subway station, and that former coworker gave him the phone number of another former coworker.  (Ex. 7 to Arato Decl. at 313:24-315:9.)

140.    Walker testified that he received a photograph of "his" purported logo design from this second former coworker, which he believes was taken from the RIAA gold plaque for *Dead Presidents*.  (Ex. 7 to Arato Decl. at 185:10-16, 314:14-316:13.) Walker testified that he has since lost the phone that contained that picture as well.  (Ex. 7 to Arato Decl. at 315:18-20, 316:23-317:2.)

141.    Walker testified that he emailed the picture he received from his former coworker to Madison Edwards, a friend of his.  (Ex. 7 to Arato Decl. at 186:9-25, 223:25, 315:9-21.)

142.    Walker testified that Edwards "extracted" the logo from photograph, and that Edwards "touched it up," including by adding a "black box" to the design, before printing it out in hard copy for Walker.  (Ex. 7 to Arato Decl. at 186:14-187:23, 218:12-219:4, 221:4-224:19, 227:7-22.)

143.    Walker testified that this hard copy was submitted as the Deposit Copy.  (Ex. 7 to Arato Decl. at 181:9-22, 186:14-21.)

144. Walker testified that Exhibit 7 at his deposition taken June 12, 2014 is a photograph taken of the same *Dead Presidents* RIAA gold plaque as the photograph he used to create the Deposit Copy.  (Ex. 7 to Arato Decl. at 220:2-221:10; Ex. 33 to Arato Decl.)

145. The Deposit Copy differs from the logo design that appears on the *Dead Presidents* commercial release, which Walker claims is his drawing.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033 (Deposit Copy), *with* Ex. 34 to Arato Decl. (copy of vinyl record for *Dead Presidents*), *and* Ex. 30 to Arato Decl. (sleeve for *Dead Presidents* vinyl record release).)

146. The R on the *Dead Presidents* commercial release includes thin outlines where the R crosses the white circle in the record element, while the Deposit Copy does not.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617; *see also* Ex. 9 to Arato Decl. at 142:3-143:17.)

147. The bend of the R on the *Dead Presidents* commercial release has a less rounded edge than the bend of the R on the Deposit Copy.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

148. The "swoosh" in the R on the *Dead Presidents* commercial release has a much less pointy end than in the Deposit Copy.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

149. The top of the R on the *Dead Presidents* commercial release does not extend to the edge of the black portion of the record element, while in the Deposit Copy, the top of the R overlaps with the edge of the record element.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

150.    The crescent portion of the R on the *Dead Presidents* commercial release overlaps with the edge of the record element, while the crescent portion of the R in the Deposit Copy does not.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

151.    The record on the *Dead Presidents* commercial release does not have a white outlined border, while the record in the Deposit Copy does.  (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

152.    The entire design in the Deposit Copy is contained within a black box field, while the design on the *Dead Presidents* commercial release contains no such black box field. (*Compare* Ex. 32 to Arato Decl. at WALKER-00014.033, *with* Ex. 30 to Arato Decl. at D000617.)

153.    Walker admits that there are "difference[s]" between the design appearing in the Deposit Copy and the design on "the actual plaque from which the picture was taken."  (Ex. 7 to Arato Decl. at 221:11-222:12.)

154.     The edge of the purported "question mark" within the champagne bottle is significantly closer to the outline of the bottle in the photograph than in the Deposit Copy. (*Compare* Ex. 33 to Arato Decl., *with* Ex. 32 to Arato Decl. at WALKER-00014.033; *see also* Ex. 7 to Arato Decl. at 221:11-222:12.)

155.    The R in the photograph is placed within the black record part of the design, while in the photograph no portion of the R appears within the black record (*Compare* Ex. 33 to Arato Decl. at, *with* Ex. 32 to Arato Decl. at WALKER-00014.033; *see also* Ex. 7 to Arato Decl. at 223:6-14.)

156.     Walker admits that the Deposit Copy also differs from the original logo drawing he allegedly submitted to Dash.  (Ex. 7 to Arato Decl. at 217:19-25.)

157.     Walker testified that on the original drawing submitted to Dash, the R was black, the record element included a black outline and a white circle, and the champagne bottle had a black outline with a black question mark.  (Ex. 7 to Arato Decl. at 216:25-217:18.)

158.     On the Deposit Copy, the R is white, the record element includes a white outline of a black circle, and the champagne bottle has a white outline with a white question mark.  (*See* Ex. 32 to Arato Decl. at WALKER-00014.033; *see also* Ex. 7 to Arato Decl. at 217:19-25 (Walker testified that the colors on the deposit copy "are not reflective of the way they appeared when [he] gave the artwork to Damon Dash").)

159.     Walker testified that the original drawing he allegedly submitted to Dash did not include a "black box," while the Deposit Copy does include a "black box."  (Ex. 7 to Arato Decl. at 227:7-22; Ex. 32 to Arato Decl. at WALKER-00014.033.)

160.     The Copyright Application represents that the alleged logo design was "Made for hire."  (Ex. 32 to Arato Decl. at WALKER-00014.027.)

Dated: New York, New York
        April 1, 2016

Respectfully submitted,

SHAPIRO ARATO LLP
By:  /s/ Cynthia S. Arato
    Cynthia S. Arato
    Chetan A. Patil

500 Fifth Avenue, 40th Floor
New York, New York 10110
Telephone: (212) 257-4880
Fax: (212) 202-6417
carato@shapiroarato.com
cpatil@shapiroarato.com

*Attorneys for Defendants UMG Recordings, Inc.*
*(erroneously sued as Universal Music Group, Inc.), The*
*Island Def Jam Music Group, a division of UMG*
*Recordings, Inc., and Roc-A-Fella Records, LLC*

COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP

By:  /s Eleanor M. Lackman
    Eleanor M. Lackman
    Scott J. Sholder

41 Madison Avenue, 34th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
ELackman@cdas.com
SSholder@cdas.com

*Attorneys for Defendant Shawn Carter ("Jay Z")*

DALE LIONEL SMITH, ESQ.

By:  /s/ Dale Lionel Smith
    Dale Lionel Smith

483 Broadway, Suite 502
New York, New York 10013
Telephone: (212) 219-1000
Fax: (212) 219-1002
dsmith@law-smith.com
*Attorney for Defendant Damon "Dame" Dash*