UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

DWAYNE D. WALKER, JR.,

                      **Plaintiff,**

        **-against-**

SHAWN CARTER ("JAY Z"), DAMON
"DAME" DASH, KAREEM "BIGGS"
BURKE, UNIVERSAL MUSIC GROUP,
INC. ISLAND DEF JAME MUSIC GROUP,
and ROC-A-FELLA RECORDS, LLC,

                      **Defendants.**

--------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/26/16

12-CV-5384 (ALC) (RLE)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      This is a dispute over the creation, ownership, and use of the logo (the "Logo") used by Roc-a-Fella Records, a record label formed by Shawn Carter ("Jay Z"), Damon "Dame" Dash, and Kareem "Biggs" Burke. Plaintiff asserts ownership of the Logo and brings breach of contract and copyright claims against Carter, Dash, and Burke, as well as UMG Recordings, Inc. ("UMG"), Island Def Jam Music Group ("Island Def Jam") and Roc-A-Fella Records, LLC ("RAF LLC") (collectively, the "Corporate Defendants").[1]

      Plaintiff casts himself as the creative mastermind of the Logo's design, though he admits that he neither came up with the idea for the Logo nor drew any part of it. Instead, he claims that nearly two decades ago, Dash described the Logo's concept to him, and he then arranged for three other men to draw elements of the Logo, directed their work, and combined the elements into the Logo. He alleges that Defendants owe him royalties for the use of the Logo, under the terms of a written contract he entered into with Dash; however, Plaintiff claims he has since lost

---

[1] Defendant Burke is *pro se* and has not appeared in this action to date. This Order will, nevertheless, continue to refer to Defendants collectively.

1

the only copy of that contract to ever exist. Plaintiff also registered a copyright for the Logo in

2010, and he brings a claim that Defendants infringed upon his copyright, by displaying and

selling items bearing the Logo in the cases of all Defendants, and by appearing in videos wearing

necklaces bearing the Logo in the cases of Carter and Dash.

Defendants now move for summary judgment on all claims, and Plaintiff moves for

partial summary judgment on three discrete issues. As set forth more fully below, Defendants'

motion is granted in full and Plaintiff's is denied, as the contract claim is barred by the lack of

evidence of a written contract and the copyright claim is time-barred.

## BACKGROUND

### I.      Factual Background

#### A.      The Parties' Submissions Pursuant to Local Civil Rule 56.1

Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern

Districts of New York requires a party moving for summary judgment to submit a "separate,

short and concise statement, in numbered paragraphs, of the material facts as to which the

moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The opposing

party must then submit a counterstatement, and "[w]here plaintiff has not responded to

defendants' factual assertions—all of which are established by documentary evidence and/or the

deposition testimony of plaintiff or her counsel," a Court may deem those facts to be

uncontroverted. *Dunkin' Donuts Inc. v. Barr Donut, LLC.*, 242 F. Supp. 2d 296, 298-99

(S.D.N.Y. 2003).

Here, Defendants filed a Rule 56.1 Statement, based in large part on the deposition

testimony of Plaintiff and his witnesses. (Def.'s Joint 56.1 Statement ("Def.'s 56.1"), ECF No.

330.) In his Rule 56.1 Counterstatement, Plaintiff declined to specifically deny or respond to the

majority of Defendants' statements, arguing that those statements recounting testimony "are descriptions of evidence on the record, to which no response is necessary." (*See, e.g.,* Pl.'s 56.1 Counterstatement ("Pl.'s Counter 56.1"), ECF No. 348, ¶¶ 42-67.) This is a somewhat puzzling argument, considering that Defendants' 56.1 Statement in large part recites Plaintiff's own testimony. *C.f. U.S. Underwriters Ins. Co. v. Allstate Ins. Co.*, No. 10 Civ. 2353, 2013 WL 3148636, at *6 (E.D.N.Y. June 19, 2013) (Party refuses to admit to any statements in Rule 56.1 statement "unless it is a direct quote" from witness's deposition). Regardless, Plaintiff has failed to properly controvert these statements, as he does not controvert these statements with citations to admissible evidence. *See* Local Civ. R. 56.1(b).

Given Plaintiff's failure to properly respond, the Court could deem all uncontroverted statements admitted. *See, e.g., Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases). But the Court has considerable discretion in deciding how to proceed where a party fails to comply with the Local Rules. *See Emanuel v. Griffin*, No. 13 Civ. 1806 (JMF), 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) (collecting cases). The Court will take a "practical approach," *Jones v. Bay Shore Union Free Sch. Dist.*, --- F. Supp. 3d ---, No. 12 Civ. 4051 (JS), 2016 WL 1056567, at *1 (E.D.N.Y. Mar. 16, 2016) (citation omitted), and examine the underlying deposition testimony where appropriate.

### B.      Parties and the Logos

Defendants Dash, Carter, and Burke are the co-founders of the Roc-A-Fella record label ("Roc-A-Fella"). (Def.'s 56.1 ¶ 1.) In 1996, the three formed a corporation called Roc-A-Fella Records, Inc. ("Roc Inc.") to operate the record label. (*Id.* ¶¶ 3-4.) In 1997, the three formed Roc-A-Fella Records, LLC ("RAF LLC"), as a joint venture with a predecessor of Defendant

UMG. (*Id*. ¶¶ 161-62.) In 2004, UMG acquired the membership interests of the three individuals defendants in RAF LLC. (*Id.* ¶ 64.)

Plaintiff Walker is an individual who claims to have, in 1995, played a role in the creation of Roc-A-Fella's Logo. (*Id.* ¶ 5.) The Logo has gone through several iterations, but Plaintiff claims to have created the version below, used on the commercial release of Carter's 1996 single, *Dead Presidents*:



*Figure 1*

(Exh. 7, Arato Aff. ("Walker Dep."), ECF No. 331-7, 165:22-166:6; 169:2-8; Exh. 30, Arato Aff. ("*Dead Presidents* Exh."), ECF No. 331-30.) In 2010, Plaintiff submitted a copyright application for the following logo:



*Figure 2*

(Exh. 32, Arato Aff. ("Copyright App."), ECF No. 331-32.)

Starting with the commercial release of Carter's first full-length album, *Reasonable Doubt* in 1996, Roc-A-Fella began using the logo below, and it has continued to use essentially that same logo up to the present:



*Figure 3*

5

(Def.'s 56.1 ¶¶ 6, 113; Exh. 31, Arato Aff. ("*Reasonable Doubt* Exh."), ECF No. 331-31.)

### C.  Plaintiff's Account of the Creation of the Logo

Plaintiff gives the following account of the creation of the Logo. According to Plaintiff, he was introduced to Dash by a friend named David Sierra in 1994. (Walker Dep. 23:10-16.) He met with Dash on multiple occasions in February or March of 1995 to discuss ideas for a clothing line, and he took on a role as a consultant. (*Id*. 26:4-28:4, 30:16-31:10.) In this time period, Plaintiff also was introduced to Carter, but they never spoke beyond exchanging greetings. (*Id.* 44:19-45:7.)

Plaintiff claims that in October or November of 1995, he was at Dash's home on a social visit when he saw a draft of a logo on a piece of paper. (Walker Dep. 46:10-25.) That logo included the word "Roc-A-Fella," and depicted people dancing on top of the letters. (*Id.* 47:3-8.) Plaintiff had also previously seen a version of the logo, used on Carter's 1994 single, "In My Lifetime," that included a champagne bottle, the word, "Jay-Z," and two champagne bottles. (*Id.* 47:16-48:10.)  Upon seeing the draft logo in Dash's home, Plaintiff said, "I could do something better than that, definitely." (*Id.* 46:23-25.) Dash also expressed dissatisfaction with the current design, and told Plaintiff that he wanted a logo incorporating an "R," an album, and a champagne glass. (*Id.* 49:18-25.) Dash asked Plaintiff how much Plaintiff would charge for the creation of a logo, and Plaintiff told him, "5 percent of everything that the logo is on and [$]3500." (*Id.* 50:2-6.) Dash said, "[A]ll right, get it done," and the two "shook on it." (*Id*. 50:12-18.)

Plaintiff himself was not a graphic designer and "wasn't a great illustrator." (Def.'s 56.1 ¶ 10.) But he eventually enlisted three individuals to work on the logo: Flavius Penchon, Freddie Mack, and Kenny Gonzalez.[2] (Walker Dep. 50:21-51:13; 58:8-25.) He decided to "use

---

[2] According to Plaintiff, Dash rejected two versions of the logo that had been drawn only by Penchon under the direction of Plaintiff. (Walker Dep. 51:14-52:19, 61:5-15.)

everybody's talents and bring it together." (*Id.* 69:10-12.) For instance, he decided Mack would

draw the circle, representing the album, because "his things come out straight, circles come out

circular."[3]  (*Id.* 69:9-10) Plaintiff gathered Mack, Gonzalez, and Penchon together at Penchon's

apartment in Brooklyn to "get this logo done." (*Id.* 61:5-15.) Plaintiff describes what happened

there as follows:

> I said, Flavi [Penchon], you do the R, Mack, you do the album, Kenny [Gonzalez],
> champagne bottle, but this is how we are going to do the champagne bottle. Abstract. So I
> need it to look like a bottle but not look like a bottle. It can't look so stiff. It has to have
> some type of flow to it. The position that we were doing before was semi-close, but with
> that bottle and the whole concept I had I was going to be able to put it all together. . . . I
> gave them a certain amount of time . . . I said we are going to free style. . . . Told
> everyone to stop. I looked at everything. Flavi's R was right on point. Mack, the album
> was right on point and Kenny the champagne bottle was right on point.[4, 5]

(*Id.* 61:15-13.) At that point, Plaintiff felt Gonzalez's champagne bottle was too "generic," and

directed Gonzalez to add an upside down "question mark" in the champagne bottle, "to represent

who Jay is, where Jay come from." (*Id.* 63:9-11, 68:19-23.) He also directed Gonzalez to add

four bubbles over the champagne bottle. (*Id.* 63:9-11.) Plaintiff himself did not physically draw

any part of the logo himself, but he "directed the whole thing" and it was his "vision." (*Id.* 62:23-

25.)

Plaintiff then directed the compilation the three elements, as follows:

> The album goes behind this, put the R right here, and drop the champagne bottle a little
> bit off the album but keep it centered so it kind of, the top of what looks like the middle
> of a album, and that's what we did.

---

[3] Plaintiff and Penchon both testified that Mack ultimately drew the album by tracing a circular object. (Walker Dep.
63:6-9; Exh. 9, Arato Aff. ("Penchon Dep."), ECF No. 331-9, 57:14-25.)
[4] Here, and throughout, the Court has corrected spelling errors in the deposition transcript.
[5] Though Plaintiff and Penchon both testified that Penchon drew the "R," when he was asked to recreate the "R"
during his deposition, he drafted two versions of the "R" that appear markedly different from the "R" in the logo.
(*See* Exhs. 10 and 11, Arato Aff., ECF Nos. 331-10 and 331-11.)

(*Id.* 61:14-20.) The next day, Plaintiff and the three drafters met at a Kinko's, where Gonzalez used tracing paper to transfer the three elements onto one piece of paper. (*Id.* 66:25-67:18.) Plaintiff then scanned the traced version, and threw away the original drawings of the elements and the traced version. (*Id.* 70:2-7.)

According to Plaintiff, the four men proceeded to Dash's studio, where Dash approved the design but balked at the earlier agreement to give Plaintiff five percent royalties. (Walker Dep. 72:14-6.) Plaintiff told him, "You have to do that. That is my copyright. My intellectual property right. Nobody would have been able to put that thought out if I didn't do that." (*Id.* 76:23-77:5.) Plaintiff took the Logo and left. (*Id.* 73:9-11.) Several days later, Plaintiff went to Dash's home; Carter and Biggs were also present. (*Id.* 76:14-16.) After a negotiation, Plaintiff and Dash "shook on" an agreement in which he would receive two percent royalties, for the next ten years after the first year of use, as well as $3,500 up front. (*Id.* 76:14-15, 78:14-23.) He did not shake hands with either Carter or Biggs. (*Id.* 77:23-78:2.)

Finally, within a couple days, Plaintiff went to Dash's studio, at Dash's behest. (Walker Dep. 83:20-24.) Dash presented him with $3,500 in single dollar bills, in a shoebox, and Plaintiff "put it in [his] pocket." (*Id.* 85:10-16.) Plaintiff asked for legal paperwork, but Dash said his lawyer was in Florida and the paperwork was not yet done. (*Id.* 84:14-18.) In the studio, with only Plaintiff and Dash present, Plaintiff claims that he wrote out the following:

> I hereby Dwayne Walker received $3500 as partial payment for creating the Roc-A-Fella logo in execution of Damon Dash as chief executive officer of Rock-A-Fella Records in which it's agreed if the logo is used after the first year two percent for the next 10 years will be payable to Dwayne Walker.

(*Id.* 84:22-85:8.) At his deposition, Plaintiff wrote out a "replica" of this agreement, which read as follows:

> I herby Dwayne D. Walker agree to accept 3500 and 2% percent for creating RocaFella Logo. In which is payable for 10 yrs after 1st year use[.] Once payment is render[e]d, I Dwayne D. Walker will transfer ownership of Logo Dame Dash in execution of RocaFella Records.

(Exh. 11, Arato Aff., ECF No. 331-11.)

Both of the above recollections of the agreement reflect an understanding that the royalty payment would become due ten years after the first year of the Logo's use. However, in a demand letter sent in 2007, Plaintiff's counsel wrote that the royalty was "payable 10 years after the execution of the contract," and Plaintiff testified that at the time the letter was sent he reviewed it and found it to be accurate. (Walker Dep. 149:4-18; Exh. 19, Arato Aff., ECF No. 331-19). Later, Plaintiff himself sent a series of emails in which he asserted that the royalty payment was due after ten years of use, rather than ten years after the first year of use. (Exhs. 22-24, Arato Aff., ECF Nos. 331-22, 331-23, 331-24.)

Setting aside the agreement's contents, Plaintiff testified that he signed the agreement, as did Dash. (Walker Dep. 84:22-85:8.) He left spaces for Biggs and Carter to sign, though they were not present. (*Id.* 84:22-85:8; 87:2-12.) The contract was on a "white piece of paper like you would use . . . from . . . a copy machine." (*Id.* 114:25-115:13.) Plaintiff claims he gave to Dash the only copy of the Logo, while Plaintiff took the only copy of the signed agreement. (*Id.* 89:22-90:17.) Plaintiff believed he still had to get a form of the contract "in legal terms" on a "lawyer's legal paper," but he "didn't make any effort" to do so." (*Id.* 207:13-20; 212:8-17.)

### D. Defendants' Account of the Creation of the Logo

Defendants dispute Plaintiff's account and claim that the Roc-A-Fella Logo was in fact created by Adrien Vargas, who was hired as Roc-A-Fella's Art Director in 1995. (Exh. 5, Arato Aff. ("Vargas Dep."), ECF No. 331-5, 13:3-10.) They claim that Vargas created the first, rudimentary version of the logo in early 1995, and that version was used on a promotional

release of *Dead Presidents* and on Dash's business card. (*Id.* 35:18-36:25, 38:23-39:5; *see also* Exhs. 28 and 29, Arato Aff., ECF Nos. 331-28 and 331-29.) The next version of the logo, displayed above as Figure 1,  appeared on the commercial release of *Dead Presidents*; it is this version that Plaintiff claims to have designed. (*Id.* 39:16-41:16; Walker Dep. 165:22-166:6, 169:2-8; *see also Dead Presidents* Exh.) Vargas was credited with "Design" on that album, under a pseudonym. (*Id.* 42:5-22). The third and final version of the logo, displayed above as Figure 3, appeared on the commercial release of *Reasonable Doubt*. (*Id.* 43:1-44:12; *see also Reasonable Doubt* Exh..) That album credited Vargas with "Art Direction," under his own name. (*Id*. 44:23-45:8; *see also Reasonable Doubt* Exh.) Roc Inc. filed for a trademark registration of the Logo on December 3, 1996. (Exh. 4, Arato Aff. ("Trademark App."), ECF No 331-4.) The application stated that the Logo had first been used on January 10, 1995. (*Id*.)

### E.      Whereabouts of Any Written Agreement

As stated above, Plaintiff claims that he was in possession of the sole copy of the written agreement with Dash. (Walker Dep. 89:22-90:17.) He kept it in a desk drawer, along with sports memorabilia and other collectibles, in an apartment he shared with his uncle in New York. (*Id.* 90:22-90:4, 98:2-8.) However, in 1996, he moved to Atlanta and left his possessions, including the contract, in the apartment. (*Id.* 92:8-93:1.) In 1998, Plaintiff's uncle passed away and other members of his family cleared out the apartment. (*Id.* 98:3-100:24.) In the process, Plaintiff lost many of his possessions, including, he claims, the contract. (*Id*.)

According to Plaintiff, only he and Dash were present at the drafting of the contract, and no one else witnessed its signing. (Walker Dep. 83:25-84:2, 201:14-23.) Plaintiff testified that he only ever showed the contract to the three individuals who drew the Logo. (*Id.* 215:20-23.) Of those three individuals, Mack testified that he does not recall ever seeing a document concerning

Plaintiff being paid for the Logo design. (Exh. 13, Arato Aff. ("Mack Dep."), ECF No. 331-13, 31:12-17.) Penchon, on the other hand, testified that Plaintiff gathered the collaborators together and "pulled out the contract." (Penchon Dep. 79:15-19.) Penchon did not, however, "focus on the contract," and recalled only that the contract had "two signatures" and had a "paragraph of some things." (*Id.* 79:22-80:14.) He agreed with the statement that "the only reason [he] kn[e]w it was a contract [was] because [Plaintiff] said that it was." (*Id.* 81:24-82:3.) Kenny Gonzalez has not testified in this matter.

Finally, Plaintiff's friend David Sierra, who did not by any account draw any element of the Logo, testified regarding the contract. He testified that he saw an unsigned version of the contract at a meeting at which he, Dash, and Plaintiff were present, and during which Plaintiff "took out" a piece of paper and handed it to Dash. (Exh. 8, Arato Aff. ("Sierra Dep."), ECF No. 331-8, 176:4-177:6.) Dash gave that version back unsigned. (*Id.* 178:3-179:6.) Plaintiff later showed a signed version of the contract to Sierra, in 1996 or 1997. (*Id.* 196:17-197:7.) Sierra testified that Plaintiff "used to walk around with it, the piece of paper, an agreement he had between Damon Dash, Jay-Z, and Biggs that he used to carry around in a white folder," and that Plaintiff "carried it around in a white looseleaf binder all the time," wherever he went. (*Id.* 94:17-21; 96:5-96:12.) Sierra estimated that Plaintiff carried it around for "five to 10 years," starting in 1994 or 1995. (*Id.* 95:17-96:17.) Sierra remembers last seeing the contract in 2000. (*Id.* 178:3-179:6.)

As to the contents of the contract, Sierra testified that the contract provided for an upfront payment of $35,000 and 2 percent royalties. (Sierra Dep. 173:17-175:2.) Per Sierra,

> It had mentioned about our 2 percent over 10 years and I think the end of the day was 2007 that was, or 2008 that it was going to be over, it was like a 10 year span or 12 year span of time.

(*Id.* 198:18-22.) Sierra later confirmed that the contract as written mentioned the date 2007. (*Id.* 427:9-12.) Sierra recalled that the contract was on lined paper, in blue ink. (*Id.* 200:4-25.) It was signed by Dash; as to whether it was signed by Plaintiff, Sierra did not "recall" his signature, and when asked to describe the appearance of Plaintiff's signature on the contract, he replied, "Why would Mr. Walker need to sign it?" (*Id.* 198:11-200:3.)

### F.    Plaintiff's Awareness of Defendants' Use

Plaintiff testified that upon the release of *Reasonable Doubt* in 1996, he noticed that Adrien Vargas had been credited with "Art Direction" and that the logo design had been altered. (Walker Dep. 166:7-167:10; Exh. 14, Arato Aff. ("Walker Dep. II"), ECF No. 331-14, 387:10-389:17). From this, he inferred that Roc-A-Fella "was going to deny that [he] had a right to the design." (Walker Dep. II 388:24-389:17.) He called both Dash and Vargas and told Dash, "You put artwork down by Adrien Vargas. People look at that they are going to assume that he did the logo. Give me my credit." (Walker Dep. 167:4-168:16.) This call apparently did not quiet Plaintiff's concerns, as the conversation "kept bothering [him]" after he hung up. (*Id.* 168:4-10, 172:19-25.)

### G.    Plaintiff's Copyright Application

In April 2010, Plaintiff filed a copyright registration for the Logo. (Copyright App.) The included Deposit Copy was not the original drawing that Plaintiff gave to Dash in 1995, and instead, it was a reconstruction of the Logo: a friend of Plaintiff took a photograph of a plaque of the *Dead Presidents* single and emailed the photo to another friend who "extracted" the Logo from the photograph and "touched it up," by adding a "black box" outline. (Walker Dep. 181:9-183:17, 186:9-25, 218:12-227:22.) Walker then filed a hard copy of this reconstruction as the Deposit Copy. (*Id.* 181:9-22, 186:14-21.) The Deposit Copy differs in some elements—

12

particularly the "R" element—from the Logo design as it appears on the plaque and as it appears on *Dead Presidents*. (*Compare* Figure 1 *with* Figure 2, above.)

In the application, Walker listed himself as the "author" of the Logo design and lists it as "Made for hire." (Copyright App.) However, at his deposition, Walker said that none of the three men who drafted the Logo worked for him and that they were instead "independent contractors," and that he signed no documents with them regarding ownership of the Logo. (Walker Dep. 132:22-134:8; 203:15-204:3.) Mack and Penchon shared that understanding. (Penchon Dep. 111:16-112:17; Mack Dep. 22:2-16, 32:13-25.)

## II.    Procedural Background

Plaintiff initiated this action on July 12, 2012. (ECF No. 1.) He subsequently amended his complaint twice, and he filed the operative Second Amended Complaint on November 1, 2013. (ECF No. 22; ECF No. 64 ("SAC").) Among other pre-discovery motions, Defendants moved to dismiss the copyright infringement claim asserted in Plaintiff's Second Amended Complaint, and the Court denied that motion. (ECF No. 67; ECF No. 129 ("Sept. 3, 2014, Order").)

This Court referred the action to Magistrate Judge Ronald L. Ellis for the purposes of discovery. (ECF No. 3.) The issues of liability and damages were bifurcated for the purposes of discovery and trial, and discovery was stayed on damages pending the determination of liability. (ECF No. 226.) After a lengthy and contentious discovery process, discovery closed in January 2016. (*See* ECF No. 317.) On April 1, 2016, Defendants moved for summary judgment as to both the contract claim and the copyright claim. (ECF Nos. 325-336.) That same day, Plaintiff moved for summary judgment as to three discrete issues: 1) whether Dash had authority to enter into a contract on behalf of Carter; 2) whether any of the defendants own any copyright rights in the Logo; and 3) whether the Corporate Defendants had a license to use the Logo and whether

the Corporate Defendants displayed or sold the Logo in an infringing manner since 2009. (ECF

Nos. 337-34; Pl.'s Mem. Summ. J. ("Pl.'s Mem."), ECF No. 340, 6.)

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and "the moving party is entitled to a judgment as a matter of law*." Cortes v. MTA New York*

*City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting A*nderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).

Material facts are those facts that may affect the outcome of the case. *Anderson*, 477 U.S. at

248. An issue of fact is "genuine" when a reasonable finder of fact could render a verdict in

favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).

"[T]he court's responsibility is not to resolve disputed issues of fact but to assess whether there

are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences

against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine

issue of material fact exists." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (quoting

*Marvel Characters v. Simon*, 310 F.3d 280, 285-86 (2d Cir. 2002)). If the moving party meets its

burden, the burden shifts to the non-moving party to bring forward "specific facts showing a

genuine issue for trial." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14 Civ. 7354

(JGK), 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citation omitted); *see also* Fed. R.

Civ. P. 56(c). The non-moving party "may not rest upon mere allegation[s] or denials of his

pleadings," *Anderson v*, 477 U.S. at 259. Rather, the non-moving party must "designate specific

facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986), and these facts must be "admissible in evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66

(2d Cir. 1997) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of *some* alleged factual

dispute between the parties" alone will not defeat a properly supported motion for summary

judgment," *Anderson*, 477 U.S. at 247 (emphasis in original), and "[i]f the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 50

(internal citations omitted). "If there are cross-motions for summary judgment, the Court must

assess each of the motions and determine whether either party is entitled to judgment as a matter

of law." *Gen. Ins. Co.*, 2016 WL 4120635, at *4 (citing *Heublein, Inc. v. United States*, 996 F.2d

1455, 1461 (2d Cir. 1993)).

## DISCUSSION

### I.    Plaintiff's Contract Claim

Plaintiff brings a breach of contract claim against all Defendants, based on the agreement

he alleges that he and Dash entered into. Defendants move for summary judgment on this claim.

They argue that any agreement between Plaintiff and Dash is unenforceable, because Plaintiff

does not produce either a written agreement or sufficient evidence to show a lost writing, as is

necessary to satisfy New York's Statute of Frauds. Plaintiff, relying in large part on New York's

Best Evidence Rule rather than Statute of Frauds-specific caselaw, argues that he has produced

sufficient evidence of a lost writing. The Court first addresses the governing law, then turns to

the merits of the dispute.

### A.    Governing Law

Plaintiff's breach of contract claim is a state law claim, and "[a] federal court exercising

supplemental jurisdiction over state law claims must apply the substantive law of the state."

*Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Where, as here, a plaintiff brings a federal copyright infringement claim and a related state-law breach of contract claim over which the Court exercises supplemental jurisdiction, the Court applies federal substantive law to the copyright claim and state substantive law to the contract claim. *See, e.g.. Frye v. Lagerstrom*, No. 15 Civ. 5348 (NRB), 2016 WL 3023324, at *4 (S.D.N.Y. May 24, 2016) (applying federal law to copyright claim and New York law to related contract claim). The Statute of Frauds is considered substantive. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 332 (2d Cir. 2012) (applying New York's Statute of Frauds to a state-law contract claim). Thus, Plaintiff's contract claim must meet any requirements imposed by New York's Statute of Frauds.

Plaintiff insists that the Court look to the Best Evidence Rule of either the Federal Rule of Evidence or of New York state, rather than the Statute of Frauds, to evaluate the evidence concerning any written agreement. (*See* Pl.'s Mem. Opp., ECF No. 347, 17-23.) Such an approach would be misguided at this juncture. The Best Evidence Rule governs the *admissibility* of parol and circumstantial evidence of a writing where the writing itself is missing. The Statute of Frauds, on the other hand, governs the *enforceability* of certain agreements required to be in writing, and as relevant here, the enforceability of those agreements where the required writing has been lost. To survive summary judgment, Plaintiff must raise a genuine issue of material fact as to the enforceability of the agreement under the Statute of Frauds.

### B.     Statute of Frauds

Under New York's Statute of Frauds, any agreement "incapable of being performed within a year of [its] making" must be "expressed in a signed writing." *Ryan v. Kellogg Partners Institutional Servs.,* 19 N.Y.3d 1, 14 (N.Y. 2012); *see* N.Y. Gen. Oblig. Law § 5-701(a)(1). This

requirement applies "only [to] those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year." *Guilbert v. Gardner,* 480 F.3d 140, 151 (2d Cir. 2007) (internal quotation marks omitted). Here, no party disputes that by the terms of the alleged contract, there was absolutely no possibility of full performance within a year, as Plaintiff claims that the agreement called for the payment of royalties accrued over a ten-year period. (Pl.'s Mem. Opp. 24.) Therefore, the agreement must satisfy the Statute of Frauds.

Plaintiff argues that the Statute of Frauds has been satisfied by the since-lost handwritten contract he entered into with Dash. When faced with this situation—where the Statute of Frauds is alleged to be satisfied by a missing writing—New York's courts have not been entirely consistent. For instance, the Third Department has adopted a bright-line rule, holding that "[e]xcept where the party invoking the protection of the Statute of Frauds admits the unproduced agreement was indeed entered into, the Statute of Frauds shelters certain transactions from the uncertainty of witness memory and the danger of fraud by immunizing them from parol evidence." *Matter of Talco Contractors Inc. v. New York State Tax Commission*, 528 N.Y.S.2d 219, 220 (3d Dept. 1988). The Fourth Department, too, has constrained the types of evidence that may be used to prove the existence of a missing writing. It held that "a party may elicit parol evidence to prove the existence and terms of a written agreement, thereby satisfying the requirements of the Statute of Frauds, when the failure to produce the original is adequately explained." *Nicosia v. Muller*, 645 N.Y.S.2d 385, 386 (4th Dept. 1996). That "parol evidence may consist of the admission of an adversary," as in the Third Department, "or the testimony of others who have first-hand knowledge of the existence of the writing and its terms." *Id*. (internal citations omitted).

The First and Second Departments have adopted looser rules. The Second Department held that "[t]he loss or destruction of a written instrument does not deprive it of effect under the Statute of Frauds. Therefore, even if no signed copy of the lease can be found, the appellants could still prove its existence by extrinsic evidence." *Lynch v. Savarese*, 629 N.Y.S.2d 804 (2d Dept. 1995) (internal citations omitted). Similarly, the First Department has held that claims based on lost writings are "not barred by the Statute of Frauds, since the plaintiff is entitled to the opportunity to prove, if she can, the existence and the contents of the lost writing by parol and circumstantial evidence" *Love v. Spector*, 215 A.D.2d 733, 733, 627 N.Y.S.2d 87, 88 (1st Dept. 1995) (citations and internal quotation marks omitted).

But though the First and Second Departments have not—as the Third and Fourth Departments have—explicitly constrained the types of evidence parties may use to prove the existence of the lost writing, they have in practice hewed closely to the limits set by the Third Department. A review of cases shows that they have denied summary judgment in cases involving lost writings where the opposing party has admitted to the existence of the writing or where the writing's proponent has produced witnesses who can testify to the signing and contents of the agreement. *See, e.g.*, *Lynch*, 629 N.Y.S.2d at 804 (opposing party admission and third-party witness to signing); *Lapidus v. New York City Chapter of the New York State Ass'n For Retarded Children, Inc.*, 118 504 N.Y.S.2d 629, 631 (1st Dept. 1986) (writing in possession of opposing party); *Dependable Lists, Inc. v. Malek*, 469 N.Y.S.2d 754, 755 (1st Dept. 1983) (opposing party admission). Further, the First Department has found that a trial court's refusal to consider parol evidence of a missing writing was proper, *see Horizon Inc. v. Wolkowicki*, 865 N.Y.S.2d 195 (1st Dept. 2008), where "plaintiffs do not offer the admission of an adversary" and instead "the only proof of the contents of the notes is the self-serving testimony of [plaintiffs'

18

agent], and plaintiffs fail to identify the terms of the writing." *Horizon Inc. v. Wolkowicki*, No. 0600305/2005, 2008 WL 279228, at *4-5 (N.Y. Sup. Ct. Jan. 15, 2008).

Faced with the varied approaches taken by the appellate divisions, federal district courts in this Circuit have generally allowed that a writing's proponent may introduce parol evidence of its existence, though they have expressed reservations and avoided the issue where possible. *See AG Ltd. v. Liquid Realty Partners, LLC*, 448 F. Supp. 2d 583, 587 (S.D.N.Y. 2006) ("[R]esort to such evidence to show the existence of a writing sufficient to satisfy the statute of frauds arises only after there has been an adequate explanation of the loss of the original. . . . [T]he Court finds plaintiff has provided no adequate explanation as to its inability to produce the signed engagement letter and that, in the absence of such, admission of parol evidence to prove its existence is barred."); *Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*, No. 01 Civ. 9788 (NRB), 2003 WL 253094, at *2 (S.D.N.Y. Feb. 4, 2003) ("While we are not unsympathetic to the concern that allowing such oral testimony plainly offends the policies the Statute of Frauds is meant to serve and presents the same risk of mistake (or worse) as testimony about an oral contract, we reject this argument on the ground that several post *Talco* decisions, have taken a contrary view and have held that a party *can* elicit parol evidence to prove the existence and terms of a written agreement." (alterations, internal citations and quotation marks omitted)); *C.I.F. Prods., Inc. v. Burlington Coat Factory Warehouse Corp.*, 881 F. Supp. 104, 106 (S.D.N.Y. 1995) ("Although the issue is not entirely free of doubt, it appears that New York law permits proof of the existence of a writing sufficient to satisfy the statute by parol evidence where the failure to produce the original is explained adequately. . . . We need not rely on this debatable proposition, however.") The only district court to actually consider the evidence found that the testimony of the plaintiff's agent that he signed an agreement, together

with the testimony of a third party who watched the execution of the agreement and was told at the time of the execution of its contents, was sufficient at least to defeat defendants' argument that plaintiff's contract claim must be dismissed at the pleading stage due to the lack of an existing written agreement. *See Circle Line*, 2003 WL 253094, at *2.

Here, though, even by the more permissive standards used by the First and Second Departments, Plaintiff does not present evidence of the existence of the writing sufficient to create a triable issue of material fact. Defendants do not admit to the existence of the writing. And the testimony presented by Plaintiff of the alleged writing is alternately contradictory, self-serving, and not based on first-hand knowledge. Plaintiff can present no witnesses to the signing of the agreement, as by his own account, only he and Dash were present when it was drafted and signed. (Walker Dep. 83:25-84:2.)  This alone puts him at a disadvantage. *C.f.  Circle Line*, 2003 WL 253094, at *2; *Lynch*, 629 N.Y.S.2d at 804. Thus, Plaintiff must rely exclusively on his own testimony and on the testimony of the other witnesses who allegedly saw the writing after it was signed, Penchon and Sierra.

Penchon testified at his deposition that Plaintiff showed him a piece of paper, that Plaintiff told him it was a contract, that the paper had two signatures on it, and that he himself did not read the contract and does not recall what it said. (Penchon Dep. 79:15-82:3.) This is not "testimony of others who have first-hand knowledge of the existence of the writing and its terms," *Nicosia*, 645 N.Y.S. 2d at 386, and thus it would be insufficient in the Fourth Department to prove the existence of the writing. Indeed, Penchon's testimony falls far short of the witness testimony that even the First and Second Departments have found sufficient to establish the existence of a missing contract: he does not profess to have witnessed the execution of the contract, nor does he profess to have any knowledge of the terms of the writing. Even under the

laxer First and Second Department standards, Panchon's testimony cannot be said to create a triable issue of fact regarding the existence of the contract.

That leaves only the testimony of Plaintiff himself and of Sierra—testimony that is completely at odds in fundamental ways. As an initial matter, Plaintiff testifies that he only ever showed the contract to the three individuals who drew the Logo (Walker Dep. 215:20-23); Sierra was not one of those individuals. Sierra, on the other hand, testifies not only that he himself saw the contract but also that Plaintiff carried the contract everywhere with him for five to ten years, in a transparent binder. (Sierra Dep. 95:17-96:17.) Moving beyond that discrepancy, Plaintiff testifies that he wrote up on the contract on the spot, with only himself and Dash present (Walker Dep. 83:25-84:2, 201:14-23); Sierra testifies that he saw the contract before it was signed, at an earlier meeting with Dash and Plaintiff. (Sierra Dep. 176:4-177:6). Plaintiff testifies that he last saw the contract in 1996 and certainly did not see it after his uncle's apartment was cleaned out in 1998 (Walker Dep. 98:3-100:24); Sierra testifies that he saw the contract in 2000. (Sierra Dep. 178:3-179:6.) Plaintiff testifies that the contract was written on blank paper (Walker Dep. 114:25-115:13); Sierra testifies that it was written on lined paper. (Sierra Dep. 200:4-25) Plaintiff testifies that he and Dash both signed the contract (Walker Dep. 84:22-85:8); Sierra testifies only to Dash's signature, and asked, "Why would Mr. Walker need to sign it?" (Sierra Dep. 198:11-200:3.) Plaintiff testifies that the contract called for a $3,500 upfront payment (Walker Dep. 84:22-85:8); Sierra testifies that it called for a $35,000 payment. (Sierra Dep. 173:17-175:2.) And Plaintiff testifies that the contract provided for a ten-year term, with no reference to an end date (Walker Dep. 84:22-85:8); Sierra testifies that it explicitly included an end date of 2007. (Sierra Dep. 198:18-22.)

In deciding a motion for summary judgment, "a district court generally should not weigh evidence or assess the credibility of witnesses." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (citation and internal quotation marks omitted). However, a court may make credibility determinations "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," as "it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Id.* (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005)). Allowing a district court to make a credibility determination in this situation serves to "prohibit[] a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax Products Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (citing *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)). While this doctrine has primarily been applied where a party submits sworn testimony that contradicts the party's own prior statements, it may also apply where a party submits contradictory evidence from non-party witnesses to defeat summary judgment. *See Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("In certain circumstance we have held that sham issue of fact doctrine applies to third-party witnesses, particularly expert witnesses."); *see also id.* (collecting cases). Application of this doctrine to non-parties may be particularly appropriate where the non-party has "a familial or other close relationship with the plaintiff that suggests [the plaintiff] could influence [the non-party's] testimony. *Id.*

Here, it is appropriate to disregard Sierra's testimony, based on his relationship to Plaintiff and the "real, unequivocal, and inescapable contradiction[s]," *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 696 (2d Cir. 2012), between Plaintiff's testimony

and Sierra's. Sierra and Plaintiff have a close relationship that suggests that Plaintiff could

influence Sierra's testimony. First, Sierra himself claims to an interest in the alleged agreement

at issue. (*See* Sierra Dep. 170:14-17 ("I wanted 5 percent for creating, help create that logo . . .");

174:13-15 ("Originally we asked for 50,000 and then they told us we had to bring it down to

35,000."); 175:6-7 ("Again, for us, the biggest concern was the percentage.")). Second, at his

deposition, Sierra initially testified that he had not actually seen the signed contract; however,

after a break in the deposition, Plaintiff's counsel told defense counsel, "I think Mr. Sierra has

something to say," at which point Sierra said that he had spoken with Plaintiff's counsel over the

break, and that he had in fact seen the contract. (Sierra Dep. 185:17-188:18.)  Third, Sierra had

previously signed an affidavit in which he stated he had seen the signed contract; that affidavit

was written by Plaintiff's counsel, and Sierra spoke with Plaintiff's counsel at least "a couple

times" prior to signing the affidavit. (Sierra Dep. 322:20-325:6.) This affidavit was only signed

*after* Defendants submitted a letter motion to this Court indicating that they planned to raise a

statute of frauds defense because Walker had no evidence of the writing beyond his own

testimony. (*See* ECF No. 97; ECF No. 114.) Considering the relationship between Plaintiff and

Sierra, Sierra's interest in the subject of this lawsuit, and the timing of the affidavit and Sierra's

later testimony, as well as the completely contradictory nature of Plaintiff and Sierra's testimony,

"no reasonable juror could believe certain of [Sierra's] factual averments," *see Rojas*, 660 F.3d at

104, and thus Sierra's testimony regarding the contract has no bearing on summary judgment.

     This leaves only Plaintiff's own self-serving testimony that he drafted the contract, that

he and Dash signed it, and that he lost track of it in 1998. This testimony alone is not enough to

create a genuine issue of material fact as to whether a writing existed. As a general matter, "a

nonmoving party's self-serving statement, without direct or circumstantial evidence to support

the charge, is insufficient to defeat a motion for summary judgment." *JF v. Carmel Cent. Sch. Dist.*, --- F. Supp. 3d ---, No. 13 Civ. 8830 (NSR), 2016 WL 866958, at *4 (S.D.N.Y. Mar. 2, 2016) (citation and alterations omitted); *see also New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 326 (S.D.N.Y. 2015) (collecting cases). Furthermore, state courts in New York have rejected "self-serving" testimony to show the existence of a writing and satisfy the Statute of Frauds. *See, e.g.*, *Horizon Inc. v. Wolkowicki*, 865 N.Y.S.2d 195 (1st Dept. 2008). Thus, Plaintiff's testimony here cannot prevent summary judgment: the alleged agreement is the type of agreement that must be in writing under New York's Statute of Frauds; any alleged writing has been lost; and Plaintiff does not present evidence sufficient to create a genuine issue of material fact as to whether the writing actually ever existed. Defendants' motion for summary judgment on the contract claim is GRANTED.[6]

## II.    Copyright Claim

Defendants next move for summary judgement on Plaintiff's copyright claim, arguing primarily that the claim is a copyright *ownership* claim rather than a copyright *infringement* claim and thus that it is barred by the statute of limitations. Plaintiff argues that his claim is one for infringement and thus that it is not barred.

Plaintiff also argues that Defendants may not now challenge the classification of the claim, as the Court previously denied Defendants' motion to dismiss on the infringement claim on the grounds that Plaintiff pleaded the claim sufficiently. (Pl.'s Mem. Opp. 4; *see also* Sept. 3, 2014, Order 4.) This is a specious argument. It should go without saying that "different standards apply to Rule 12(b)(6) motions to dismiss and Rule 56 motions for summary judgment," and so

---

[6] Because the Court finds that Plaintiff's contract claim is barred by the Statute of Frauds, the Court need not reach the various alternate grounds for summary judgment advanced by Defendants, for instance that any alleged breach of contract was discharged because Plaintiff was never able to perform under the alleged contract.

"[e]ven after denying a motion to dismiss, a district court may still grant a summary judgment motion if, based upon the evidence presented, there was no genuine dispute as to any material fact and the moving party was entitled to judgment as a matter of law." *Linares v. McLaughlin*, 423 F. App'x 84, 85 (2d Cir. 2011) (citations omitted). The fact that the Court earlier denied the motion to dismiss the infringement claim has no bearing on Defendants' argument at summary judgment regarding the classification of the claim, and the Court considers that argument now. *See Kwan v. Schlein,* 634 F.3d 224, 229-30 (2d Cir. 2011) (affirming district court finding at summary judgment stage that plaintiff raised an ownership claim, in case where district court earlier denied defendants' motion to dismiss plaintiff's infringement claim); *Kwan v. Schlein*, 246 F.R.D. 447, 450 (S.D.N.Y. 2007) (describing procedural history).

### A.    The Nature of Plaintiff's Claim

"Civil actions under the Copyright Act must be brought 'within three years after the claim has accrued.'" *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (quoting 17 U.S.C. § 506(b)). "An ownership claim accrues only once, when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Id*. (citation and internal quotation marks omitted). "By contrast, an infringement action may be commenced within three years of *any* infringing act, regardless of any prior acts of infringement . . . " and the three-year limitations period "bar[s] only recovery for infringing acts occurring outside the three-year period." *Id*. (citation omitted). But "[w]here . . . the ownership claim is time-barred, and ownership is the dispositive issue, any attendant infringement claims must fail." *Id*. Put differently, "where the gravamen of a plaintiff's copyright claims is ownership, and not infringement, the infringement claims are barred if the ownership claim is time-barred, even if the infringing acts occurred within the last three years." *Tolliver v. McCants*, No. 05 Civ. 10840 (JFK), 2009 WL 804114, at

*10 (S.D.N.Y. Mar. 25, 2009) (quoting *Barksdale v. Robinson*, 211 F.R.D. 240, 246 (S.D.N.Y. 2002)) (alterations and internal quotation marks omitted), *aff'd*, 486 F. App'x 902 (2d Cir. 2012)

Thus, the question of how to classify a claim is of great consequence. As the Second Circuit has explained, infringement claims require a plaintiff to establish ownership of a valid copyright and copying of the constituent elements of the work. *Kwan*, 634 F.3d at 229. "In many infringement cases, the first element (ownership) is not at issue," and the issue is instead whether the defendant impermissibly copied the work. *Id*. In contrast, where a dispute "does not involve the nature, extent or scope, of copying . . . ownership forms the backbone of the 'infringement' claim at issue . . ." and if an ownership claim would be time-barred, any infringement claim is likewise time-barred. *Id*. The question, then, is whether "the plaintiff's claims [are] rooted in her contested assertion of an ownership interest in the copyright." *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016).

To answer that question, courts must examine the substance of the claim, rather than how plaintiffs label the cause of action. *See, e.g., Simmons v. Stanberry*, No. 10 Civ. 5815 (DLI), 2012 WL 1004857, at *3 (E.D.N.Y. Mar. 23, 2012); *Brand v. RMM*, No. 10 Civ. 0287 AJP, 2011 WL 1496344, at *4 (S.D.N.Y. Apr. 18, 2011); *Minder Music Ltd. v. Mellow Smoke Music Co.*, 98 Civ. 4496, 1999 WL 820575 at *2 (S.D.N.Y. Oct. 14, 1999). Courts should consider factors such as: whether the plaintiff concedes in any filings that questions of ownership and authorship are "at the heart" of the claim, *Barksdale*, 211 F.R.D. 240, 246 (S.D.N.Y. 2002); whether the plaintiff's copyright ownership is conceded by the defendant, *Kwan*, 634 F.3d at 230 (citing *Ortiz v. Guitian Bros. Music Inc.*, No. 07 Civ. 3897 (RJS), 2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29, 2008)); whether the plaintiff alleges anything specific about the means of infringement, *Newsome v. Brown*, 01 Civ. 2807, 2005 WL 627639 at *5-6 (S.D.N.Y. Mar. 16, 2005); and

whether "the lawsuit is between two parties who claim ownership of the copyrights." *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 542-43 (S.D.N.Y. 2015).

Here, it is clear that while Plaintiff styles his copyright claim as a claim for infringement, ownership in fact forms the backbone of the claim. Most importantly, Plaintiff himself has placed the ownership of the Logo at the center of this litigation. In his own motion for summary judgment, Plaintiff asserts that "although the defendants do not admit that Walker made the Logo, there is no dispute that none of the defendants own any copyright rights in the Logo," and asks that the Court "rule on this issue now." (Pl.'s Mem. 6, 8-9.) By asking the Court to grant summary judgment on this issue, Plaintiff implicitly acknowledges that the question of the ownership of the copyright is not just relevant but determinative of the copyright claim. *See, e.g., SEC v. Thrasher*, 152 F.Supp.2d 291, 295 (S.D.N.Y. 2001) ("The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues."); *Melini v. 71st Lexington Corp.*, No. 07 CIV. 701 (JCF), 2009 WL 413608, at *3 (S.D.N.Y. Feb. 13, 2009) (same); *St. Barnabas Hosp. v. Amisys, LLC*, No. 04 Civ. 2778 (KMW), 2007 WL 747805, at *8 (S.D.N.Y. Mar. 9, 2007) (same). Plaintiff is hoisted by his own petard: he cannot plausibly maintain that this is a pure infringement action while simultaneously asking this Court to rule on the question of copyright ownership. *See Barksdale*, 211 F.R.D. at 246.

This focus on ownership has been present throughout the litigation. For instance, in the Second Amended Complaint, Plaintiff alleged that he had "publicly declared his ownership of the Artwork continually since creating in the Artwork in 1995." (SAC ¶ 67.) During discovery, questions of ownership remained central, as Plaintiff sought to establish through deposition testimony and interrogatories that he—and not Adrien Vargas—had drawn the Logo. (*See, e.g.,*

Walker Dep. 61:5-64:15; ECF No. 146 (referring to Plaintiff's requests for "All documents concerning purchase or acquisition of logo, and for documents from Vargas); ECF No. 152). Indeed, apparently recognizing the importance of Vargas's testimony on the question of ownership, Plaintiff moved to preclude the Corporate Defendants' counsel from also representing Vargas, citing an alleged conflict of interest and arguing that "it is impossible for the Court to have confidence [Vargas] is being encouraged to testify truthfully." (ECF No. 239.) These various concessions by Plaintiff weigh in favor of construing the copyright claim as one of ownership. *Barksdale*, 211 F.R.D. 240, 246 (S.D.N.Y. 2002).

Compared to his repeated recognition that ownership is at the heart of this case, Plaintiff's infringement allegations are paltry. Plaintiff alleges that infringement occurred between July 2009 and July 2012, when he filed his suit. (Pl.'s Mem. 13.) Plaintiff alleges—and the Corporate Defendants admit—that sales of items bearing the Logo reached $350 million through 2006. (Pl.'s 56.1 Statement, ECF No. 338 ("Pl.'s 56.1"), ¶ 18.) But Plaintiff presents little in terms of specific acts of infringement: for the Corporate Defendants, he states that they displayed the Logo on a website for a "certain period of time" and alleges, in conclusory fashion, that they "used the Logo in ways that would infringe on a copyright of the Logo since 2009" (*Id.* ¶ 19), and for Carter and Dash, he similarly states that since 2009 they have "displayed" the Logo in a way that would violate a copyright of the Logo. (*Id.* ¶¶ 20, 21.) In support of those allegations, he relies in large part on two videos that depict Dash and Carter wearing chains bearing the Logo.[7] Both of these videos were uploaded to the internet after the filing of this suit

---

[7] The video of Dash is a recording of a radio interview that was purportedly recorded in 2009, and published to YouTube only on March 23, 2015; Dash appears to wear a chain bearing the Logo throughout the recording. *See* Hip Hop Motivation, *Damon Dash "The Breakfast Club Interview" (Response to Criticism*, YouTube (Mar. 23, 2015), available at https://www.youtube.com/watch?v=d5UhD-cDSow. The video of Carter is a music video released by Carter's wife, Beyoncé Knowles-Carter, for her song "Drunk in Love," on which Carter also performs and which was published to YouTube on December 16, 2013; Carter appears to wear a chain bearing the Logo at several

in 2012, but even setting aside the timing issue, this evidence that each Defendant wore the Logo on a single occasion at some point does little to sustain Plaintiff's broad allegation that the Defendants have infringed repeatedly since 2009.[8] That this is the extent of evidence of infringement developed over the four-year history of this case suggests that infringement is not, in fact, central to the claim. *See Newsome*, 2005 WL 627639 at *5-6.

Finally, Defendants do not concede Plaintiff's ownership, and Defendants and Plaintiff himself provide evidence that third parties might have claims to ownership. At the outset, Defendants do not concede Plaintiff's ownership. *See Kwan*, 634 F.3d at 230; Def.'s 56.1  ¶ 95. Plaintiff makes much of the fact that Defendants do not present evidence that they own or co-own the copyrighted item. But Defendants' ownership of the copyright is irrelevant; instead, the question is whether the *plaintiff* is "seeking a declaration of sole ownership." *Big E. Entm't, Inc. v. Zomba Enterprises, Inc*, 453 F. Supp. 2d 788, 794 (S.D.N.Y. 2006) (quoting *Barksdale*, 211 F.R.D. at 244)), *aff'd* 259 F. App'x 413 (2d Cir. 2008). To that end, though courts have looked to whether defendants themselves assert a right of ownership in determining whether a claim is for ownership or infringement, *see Flo & Eddie*, 80 F. Supp. 3d at 542, that inquiry is aimed at determining if there is an actual dispute of ownership, more so than if the *defendant* owns the copyright. *See id*. (finding an infringement claim rather than an ownership claim where defendant did not assert ownership, and "offered not a scintilla of evidence" to support the assertion that any party other than the plaintiff might have a claim of ownership).

---

moments. *See* beyonceVEVO, *Drunk in Love (Explicit) ft. JAY Z*, YouTube (Dec. 16, 2013), available at https://www.youtube.com/watch?v=p1JPKLa-Ofc.

[8] Plaintiff also argues that all Defendants admitted that they infringed by failing to respond to certain Requests for Admissions or by objecting to them, rather than responding. (Pl.'s Mem. Opp. 4.) But these arguments are unavailing. The Requests for Admission that were not responded to were untimely filed, and thus no response was required, *see, e.g. Siao-Pao v. George*, No. 90 Civ. 5376 (PKL), 1992 WL 236184, at *3 (S.D.N.Y. Sept. 10, 1992), and the Federal Rules allow parties to respond to Requests for Admission by way of a "written answer *or objection*." Fed. R. Civ. P. 36(a)(4).

In this case, regardless of Defendants' own claims to the copyright, all parties have presented ample evidence that, at the very least, third parties have colorable claims of ownership. For instance, Adrien Vargas testified at length regarding his alleged creation of the Logo. And on the other side, Plaintiff and his witnesses testified that at least three other individuals had a hand in creating the Logo—and that Dash described to Plaintiff the general concept. All of this points to a genuine dispute over both the authorship and the ownership of the Logo, supported by far more than a "scintilla of evidence." *See Flo & Eddie*, 80 F. Supp. 3d at 542. Whether Defendants dispute Plaintiff's ownership on their own behalf or on the behalf of non-parties, *see Urbont v. Sony Music Entm't*, No. 15-1778-CV, 2016 WL 4056395, at *3 (2d Cir. July 29, 2016) (defendant may challenge plaintiff's ownership by positing ownership in a third party), this dispute over ownership forms the gravamen of Plaintiff's claim.

The dispute here "does not involve the nature, extent or scope, of copying," and instead, "ownership forms the backbone of the 'infringement' claim at issue." *Kwan*, 634 F.3d at 229. If an ownership claim would be time-barred, this "attendant infringement claim[] must fail." Accordingly, the Court proceeds to the question of whether the claim is time-barred.

### B.     Accrual of Claim

An ownership claim must be commenced within three years after the claim accrued. 17 U.S.C § 507(b). "An ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316 (2d Cir. 2013) (citations and internal quotation marks omitted). "Although an alleged author is aware of his claim to ownership of the work from the moment of its creation, the author does not need to bring suit until there has been an 'express repudiation' of that claim." *Id.* (citations and internal quotation marks omitted). "Any number of

30

events can trigger the accrual of an ownership claim, including an express assertion of sole authorship or ownership." *Id.* (citations, alterations, and internal quotation marks omitted). The claim may accrue "when a book is published without the alleged co-author's name on it; when alleged co-authors are presented with a contract identifying the defendant as the 'sole owner and copyright holder,' or when alleged co-owners learn they are entitled to royalties that they are not receiving." *Id.* (internal citations omitted).

Drawing all inferences in favor of Plaintiff, the non-moving party, the claim accrued at the latest in 2007. Defendants present a number of points at which they argue Plaintiff was put on notice by "express repudiation" of his ownership: (1) in 1996, when *Reasonable Doubt* was released and Vargas was credited with art direction (Walker Dep. 166:7-168:2); (2) also in 1996, in the wake of the release of *Reasonable Doubt*, when Plaintiff called Vargas and Dash to confront them about ownership, and the conversation admittedly left Plaintiff unsettled (Walker Dep. 167:4-172:25); and (3) in 2007, at the latest possible end-date of Plaintiff's purported contract, at which point he would have been due royalty payments that he has never received. (SAC ¶ 61.) The first two instances might present genuine issues of fact, as the exact content of Plaintiff's conversation with Dash is unclear, and an "Art Direction" credit to another person might not have the same implications as an authorship credit to another person in the book context. But the third instance is clear-cut: by Plaintiff's own account, he was to receive a lump-sum royalty payment for sales of items bearing the Logo made during the 10-year period preceding 2007; Roc-A-Fella Records had sold hundreds of millions of dollars' worth of products bearing the Logo; and Plaintiff never received any royalty payments in 2007 or thereafter. The claim accrued in 2007, when Plaintiff, by his own account, learned that he was entitled to royalties that he did not receive. *See Gary Friedrich*, 716 F.3d at 316; *see also Mahan*

*v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (finding that defendant Roc-A-Fella

Records "had long ago expressly repudiated [the] ownership claims" of "an experienced sound

engineer in the recording industry," who had "received no royalties for the sale of the Albums

for fourteen years," where "[t]he Albums, which have sold millions of copies since being

released in 1999 and 2000, bear a copyright notice that lists Roc–A–Fella Records as the sole

copyright owner.").

 This suit was not filed until 2012, well more than three years after the claim accrued in

2007. Thus, the claim is time-barred, and Defendants' motion for summary judgment on the

copyright claim is granted.[9]

## CONCLUSION

 For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and

Plaintiff's motion for partial summary judgment is DENIED. The Clerk of Court is respectfully

directed to close this case.

**SO ORDERED.**

**Dated**: September 26, 2016
   New York, New York

           **ANDREW L. CARTER, JR.**
           **United States District Judge**

---

[9] Because the Court finds that Plaintiff brings an ownership claim and that his claim is time-barred, the Court need not reach the various alternate grounds for summary judgment advanced by Defendants, for instance that Plaintiff himself has no ownership interest in the Logo, and even if he does, that he granted the Defendants an express license to use the Logo.